UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANN WINTERS, Derivatively on Behalf of Nominal Defendant STAPLES, INC., <br><br> Plaintiff, <br><br> v. <br><br> THOMAS G. STEMBERG, MARTIN E. HANAKA, JOHN B. WILSON, LOUIS R. PEPI, JOSEPH S. VASSALLUZZO, DEMOS PARNEROS, RONALD L. SARGENT, PATRICK HICKEY, JOHN J. MAHONEY, SUSAN S. HOYT, JEFFREY L. LEVITAN, RICHARD R. GENTRY, JEANNE B. LEWIS, EDWARD C. HARSANT, JOHN C. BINGLEMAN, DAVID B. CROSIER, JAMES C. PETERS, BRIAN T. LIGHT, JOSEPH G. DOODY, JACQUES LEVY, JACK VANWOERKOM, ROBERT J. MOORE, DEBORAH G. ELLINGER, ROBERT K. MAYERSON, JEFFREY E. NACHBOR, BASIL L. ANDERSON, BRENDA C. BARNES, ARTHUR M. BLANK, MARY ELIZABETH BURTON, ROWLAND T. MORIARITY, ROBERT C. NAKASONE, MARTIN TRUST and PAUL F. WALSH, <br><br> Defendants, <br><br> and <br><br> STAPLES, INC., <br><br> Nominal Defendant. | No. _____ <br><br> **SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> 07 CA 10193. WGY <br><br> MAGISTRATE JUDGE Bowler <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Ann Winters, by the undersigned attorneys, submits this Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1. This is a shareholder's derivative action brought for the benefit of nominal defendant Staples, Inc. ("Staples" or the "Company") against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, statutory violations and other violations of law.

2. This action arises from the Individual Defendants'(as defined herein) repeated and egregious breaches of their fiduciary duties to the Company and its shareholders by approving and/or acquiescing in the issuance of stock options to Company employees and directors that were unlawfully "backdated" to provide the recipients with windfall compensation at the direct expense of the Company.

3. A stock option is the right to purchase a stock for a specified period of time at a fixed price, called the "exercise price" or "strike price." The exercise price is generally fixed to the market price of the stock on the date of grant. If the stock's market price exceeds the exercise price, the option holder may exercise the stock option, by purchasing the stock from the Company at the exercise price, and resell it at the higher market price, profiting from the difference.

4. When the grant date of a stock option is manipulated to an earlier date on which the stock closed at a lower price – *i.e.*, when the stock option is "backdated" – the grantee pays less for the stock and the corporation, the counterparty to the stock option grant, receives less when the stock option is exercised. When stock options are backdated in this manner for the benefit of insiders (as they were in this case), the stated purposes behind the Company's stock option plans – encourage retention and promote identity of interest with Staples' stockholders – is undermined to the detriment of the Company and its shareholders, because the stock options

are already "in the money"[1] when granted. Backdating stock option grants thus represents a direct and continuing waste of valuable corporate assets.

5. To achieve the Company's stated goal of strengthening the Company's ability to attract and retain key employees who are expected to contribute to the Company's growth and success, Staples's shareholder-approved stock option plans provide that the exercise price of a stock option cannot be "***less than the fair market value of the common stock on the date of grant or at an exercise price not less than 110% of the fair market value in the case of incentive stock options granted to optionees holding more than 10% of the voting power of Staples***." However, the Individual Defendants blatantly violated this and other provisions of the Company's stock option plans by backdating Staples stock options in order to illegally maximize the grantees' profits. As such, and as detailed below, the Individual Defendants' acts were *ultra vires* – unauthorized and beyond the scope of power granted to them.

6. On September 6, 2006, the United States Senate Committee on Finance held a hearing entitled "Executive Compensation: Backdating to the Future/Oversight of current issues regarding executive compensation including backdating of stock options; and tax treatment of executive compensation, retirement and benefits."

7. At the Senate Finance Committee Hearing, the Senate Finance Committee Chairman, Senator Chuck Grassley, in his opening statement, stated: "[Options backdating] is behavior that, to put it bluntly, is disgusting and repulsive. It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get mine.' . . . [S]hareholders and rank-and-file employees were

---

[1] "In the money" refers to when the exercise price of a stock option is below the market price of the underlying stock. *See* infra.

ripped off by senior executives who rigged stock option programs – through a process called 'back-dating' – to further enrich themselves. And as we have found far too often in corporation scandals of recent years, boards of directors were either asleep at the switch, or in some cases, willing accomplices themselves. . . ."

8.  At the Senate Finance Committee Hearing, SEC Chairman Christopher Cox, stated, "Rather obviously, this fact pattern [of backdating options] results in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a violation of the tax laws." The Commissioner of the IRS Mark Everson agreed and further stated, "Picking a date on which the stock price was low in comparison with the current price gives the employee the largest potential for gain on the option and makes it possible for the employee to benefit from corporate performance that occurred before the option was granted."

9.  In his statement before the Senate Finance Committee, Deputy Attorney General Paul J. McNulty, described the practice of stock option backdating "as a brazen abuse of corporate power to artificially inflate the salaries of corporate wrongdoers at the expense of shareholders," and said "For some of those companies that have now disclosed backdated grants, corporate reputations have been tarnished and shareholder value has diminished substantially. . . ."

10. On September 6, 2006, *MarketWatch*, in an article titled "SEC Probing more than 100 firms on options: Cox," quoted the Senate Banking Committee Chairman, Senator Richard Shelby, saying that manipulation of options grant dates "appears to be a black-and-white example of securities fraud," and "Corporate officers and directors engaging in this practice are cheating the owners of the company and should be held accountable to the fullest extent possible."

11. On July 20, 2006, in a press conference announcing the SEC's decision to file civil and criminal charges for stock option backdating against Brocade Communications Systems, SEC Chairman Christopher Cox described the importance of "stamp[ing] out fraudulent stock option backdating." Chairman Cox emphasized that "[T]his issue is important because it goes to the heart of the relationship between a corporation and its shareholders. In order for our system of public ownership to work, the interests of shareholders, and not the personal interests of the company's management or its directors, must be paramount. The proper use of options for compensation can be an important tool for companies that produces tangible benefits for shareholders. But options backdating strikes at the heart of investor confidence in our capital markets. It deceives investors and the market as a whole about the financial health of companies that cheat in this way. It understates a company's compensation expenses and overstates the company's income."

12. Chairman Cox continued at that press conference by stating that, "[backdating in many cases] makes a hash of (companies') financial statements . . . [and is] poisonous [to efficient markets]. . . . It is securities fraud if you falsify books and records. It is securities fraud if you present financial statements to the SEC that do not comply with generally accepted accounting principles. There is no requirement that (the defendant) personally profit [to prove that a crime occurred.]"

13. On June 18, 2006, in an article titled, "Options Scandal Brewing in Corporate World," SEC Chairman Christopher Cox was quoted, saying "[Backdating options] isn't a question about 'Whoops, I may have (accidentally) crossed a line here . . . . It's a question of knowingly betting on a race that's already been run."

14. On May 26, 2006, *Forbes*, in an article titled, "The Next Big Scandal," quoted Former Securities and Exchange Commission ("SEC") Chairman Harvey L. Pitt, saying "What's so terrible about backdating options grants? For one thing, it likely renders a company's proxy materials false and misleading. Proxies typically indicate that options are granted at fair market value. But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders."

15. On November 14, 2006, Staples revealed that the Company conducted a review of its historical stock option granting practices during the period of 1997 to the present. Specifically, Staples stated:

> Q3 Stock Based Compensation Correction
>
> During the third quarter of 2006, the company and its Audit Committee, assisted by outside counsel, conducted a review of the company's historical stock option granting practices during the period from 1997 to the present. Based on the results of the review, ***the company has recorded a $10.8 million expense ($8.6 million net of taxes) in the third quarter to reflect the cumulative impact of accounting errors due to the use of incorrect measurement dates***, without restating any historical financial statements. The Company has concluded that the use of incorrect measurement dates was not the result of intentional wrongdoing and has taken steps to improve the controls over its option granting processes. (Emphasis added.).

16. As alleged in detail herein, in gross breach of their fiduciary duties as officers and/or directors of Staples, the Individual Defendants colluded with one another to:

    a.    improperly backdate hundreds of thousands of grants of Staples stock options to Staples's executive officers and directors, in violation of the Company's shareholder-approved stock option plans;

    b.    improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles ("GAAP");

    c.    improperly take tax deductions based on the backdated

    stock options, in violation of Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"); and

  d. produce and disseminate to Staples shareholders and the market false financial statements and other SEC filings that improperly recorded and accounted for the backdated stock option grants and concealed the improper backdating of stock options.

17. As a result of the Individual Defendants' egregious misconduct, Staples has sustained significant damages, and the recipients of the backdated Staples stock options have garnered millions of dollars in unlawful proceeds.

## JURISDICTION AND VENUE

18. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

19. Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

20. Plaintiff Ann Winters is, and was at all relevant times, a shareholder of nominal defendant Staples.

21. Nominal defendant Staples, Inc. is a Delaware corporation with its principal

executive offices located at Five Hundred Staples Drive, Framingham, Massachusetts 01702. According to its public filings, Staples is the world's leading office products company.

### Officer Defendants

22.     Defendant Thomas G. Stemberg ("Stemberg") founded the Company and has served as the Company's Chairman Emeritus of the Board since March 2005. Stemberg also served as the Company's Chairman of the Board from February 1988 to March 2005, as a part-time associate and Non-Executive Chairman from February 2004 to March 2005, as Executive Chairman from February 2002 to January 2004, and as Chief Executive Officer from January 1986 to February 2002.

23.     Defendant Martin E. Hanaka ("Hanaka") served as the Company's President and Chief Operating Officer from August 1994 to October 1997, and as a Director from May 1996 to October 1997.

24.     Defendant John B. Wilson ("Wilson") served as the Company's Executive Vice President - Finance & Strategy and Chief Financial Officer from November 1992 to in or about 2000.

25.     Defendant Louis R. Pepi ("Pepi") served as the Company's Executive Vice President - Human Resources from August 1994 to in or about May 1995, as President of the "Staples, The Office Superstore" division from April 1993 to August 1994, and as Executive Vice President - Operations from October 1990 to April 1993.

26.     Defendant Joseph S. Vassalluzzo ("Vassalluzzo") served as the Company's Vice Chairman from December 1999 to in or about 2004 and in various other capacities since he joined the Company in September 1989, including President, Realty and Development from October 1997 to December 1999, as President - Staples Realty from September 1996 to October

1997, as Executive Vice President - Growth and Development from November 1993 to September 1996, and as Executive Vice President - Growth and Support Services from April 1993 to November 1993.

27. Defendant Demos Parneros ("Parneros") has served as the Company's President - U.S. Retail Stores since April 2002. Prior to April 2002, Parneros served in various capacities since joining Staples in October 1987, including Senior Vice President of Operations from March 1999 to March 2002 and Vice President of Operations from September 1996 to February 1999.

28. Defendant Ronald L. Sargent ("Sargent") has served as the Company's Chief Executive Officer since February 2002, as Chairman of the Board since March 2005 and as a Director since December 1999. Sargent also served as the Company's President from November 1998 to March 2005, as Chief Operating Officer from November 1998 to February 2002, as President - North American Operations from October 1997 to November 1998, as President - Staples Contract & Commercial from June 1994 to October 1997, and in various other capacities since joining the Company in March 1989.

29. Defendant Patrick Hickey ("Hickey") served as the Company's Senior Vice President - Corporate Controller from November 1999 to in or about 2002, as Vice President and Treasurer from September 1997 to November 1999, as Vice President - Financial Planning, Analysis & Reporting from January 1996 to September 1997, as Director of Financial Planning from October 1994 to January 1996, and in various other capacities since joining Staples in June 1993.

30. Defendant John J. Mahoney ("Mahoney") has served as the Company's Vice Chairman and Chief Financial Officer since January 2006. Mahoney also served as the

Company's Executive Vice President, Chief Administrative Officer and Chief Financial Officer from October 1997 to January 2006, and as Executive Vice President and Chief Financial Officer from September 1996 to October 1997.

31. Defendant Susan S. Hoyt ("Hoyt") has served as the Company's Executive Vice President - Human Resources since July 1996.

32. Defendant Jeffrey L. Levitan ("Levitan") served as the Executive Vice President - Strategy/Business Development for Staples.com from September 1999 to in or about 2000, as Senior Vice President - Strategy, New Business Development and Staples.com from November 1998 to September 1999, and as Senior Vice President - Strategic Planning and Business Development from August 1996 to November 1998.

33. Defendant Richard R. Gentry ("Gentry") served as the Company's Executive Vice President - Merchandising & Supply Chain Management from January 2001 to in or about 2002 and as Executive Vice President - Merchandising from February 1996 to December 2000.

34. Defendant Jeanne B. Lewis ("Lewis") served as President - Staples.com from September 1999 to in or about 2002, as Executive Vice President - Marketing from November 1998 to September 1999, as Senior Vice President - Marketing from February 1998 to November 1998, as Senior Vice President - Marketing and Small Business from April 1997 to February 1998, as Vice President/Divisional Merchandise Manager from 1996 to April 1997, as Director of Operations and Director of Sales and Marketing from 1994 to 1996, and in various other capacities since she joined Staples in April 1993.

35. Defendant Edward C. Harsant ("Harsant") served as the Company's President - North American Stores from August 2000 to in or about 2002 and as President - The Business Depot, Ltd. from January 1995 to August 2000.

36. Defendant John C. Bingleman ("Bingleman") served as the Company's President - Staples International from February 1997 to June 2000 and as President - North American Superstores from August 1994 to February 1997.

37. Defendant David B. Crosier ("Crosier") served as the Company's Executive Vice President - Supply Chain Management from June 1998 to in or about 2000.

38. Defendant James C. Peters ("Peters") served as the Company's President - U.S. Stores from March 1998 to in or about 2000 and as Executive Vice President - U.S. Stores from September 1997 to March 1998.

39. Defendant Brian T. Light ("Light") has served as the Company's Chief Information Officer since January 2006. Light also served as the Company's Executive Vice President, Staples Business Delivery from January 2002 to January 2006, as Executive Vice President and Chief Information Officer from February 2000 to January 2002, and as Senior Vice President and Chief Information Officer from February 1998 to February 2000.

40. Defendant Joseph G. Doody ("Doody") has served as the Company's President - Staples North American Delivery since March 2002. Doody also served as the Company's President - Staples Contract & Commercial from November 1998 to March 2002.

41. Defendant Jacques Levy ("Levy") served as the Company's President - Staples International from April 2000 to September 2003.

42. Defendant Jack VanWoerkom ("VanWoerkom") has served as the Company's Executive Vice President, General Counsel and Secretary since March 2003. VanWoerkom also served as the Company's Senior Vice President, General Counsel and Secretary from March 1999 to March 2003.

43. Defendant Robert J. Moore ("Moore") served as the Company's Executive Vice

President - Marketing from November 1999 to in or about 2001.

44.  Defendant Deborah G. Ellinger ("Ellinger") served as the Company's Senior Vice President - Strategic Planning & New Business Development from June 1999 to November 2001.

45.  Defendant Robert K. Mayerson ("Mayerson") served as the Company's Senior Vice President and Treasurer from October 2002 to in or about 2004, as Senior Vice President and Corporate Controller from September 1997 to 1999, as Senior Vice President and Treasurer from April 1997 to September 1997, and as Vice President and Treasurer from August 1993 to April 1997.

46.  Defendant Jeffrey E. Nachbor ("Nachbor") served as the Company's Senior Vice President, Corporate Controller from April 1993 to February 2005.

47.  Collectively, defendants Stemberg, Hanaka, Wilson, Pepi, Vassalluzzo, Parneros, Sargent, Hickey, Mahoney, Hoyt, Levitan, Gentry, Lewis, Harsant, Bingleman, Crosier, Peters, Light, Doody, Levy, VanWoerkom, Moore, Ellinger, Mayerson and Nachbor are referred to herein as the "Officer Defendants."

### Director Defendants

48.  Defendant Basil L. Anderson ("Anderson") has served as a Director of the Company since 1997. Anderson also served as a member of the Audit Committee of the Board ("Audit Committee") from 1997 to 2001, including as Chairman from 1998 to 2001. Anderson also served as the Company's Vice Chairman of the Board from September 2001 to March 2006.

49.  Defendant Brenda C. Barnes ("Barnes") has served as a Director of the Company since June 2002 and as a member of the Compensation Committee of the Board ("Compensation Committee") since 2003. Barnes also served as a member of the Audit Committee in 2002 and

2003.

50. Defendant Arthur M. Blank ("Blank") has served as a Director of the Company since 2001 and as a member of the Compensation Committee since 2001.

51. Defendant Mary Elizabeth Burton ("Burton") has served as a Director of the Company since June 1993 and as a member of the Audit Committee since at least 1994.

52. Defendant Rowland T. Moriarity ("Moriarity") has served as a Director of the Company since March 1986.

53. Defendant Robert C. Nakasone ("Nakasone") has served as a Director of the Company since January 1986. Nakasone also served as a member of the Compensation Committee from at least 1994 to 2002, including as Chairman from at least 1994 to 1999.

54. Defendant Martin Trust ("Trust") has served as a Director of the Company since June 1987. Trust also served as a member of the Compensation Committee from at least 1994 to 1995 and from 1996 to 2003, including as Chairman from 1999 to 2003.

55. Defendant Paul F. Walsh ("Walsh") has served as a Director of the Company since December 1990 and as a member of the Audit Committee since at least 1994, including serving as Chairman from at least 1994 to 1998 and since 2001.

56. Collectively, Officer Defendants Stemberg, Hanaka and Sargent, and defendants Anderson, Barnes, Blank, Burton, Moriarity, Nakasone, Trust and Walsh are referred to herein as the "Director Defendants."

57. Collectively, the Officer Defendants and Director Defendants are referred to herein as the "Individual Defendants."

58. As executive officers and/or Board members, the Individual Defendants approved and received the backdated Staples stock options at issue in this case. The Individual Defendants

assisted in the preparation of Staples's annual and quarterly reports from 1994 through 2004 and reviewed, approved and/or helped to prepare each proxy statement Staples filed from 1995 to 2004, which falsely represented that Staples stock options were granted at the fair market value per share of common stock on the date of the grant, in order to conceal the existence of and their participation in the Individual Defendants' integrated and continuous scheme to backdate (and conceal the backdating of) Staples stock option grants. As a result of the foregoing, the Individual Defendants personally and financially benefited from the backdated Staples stock option grants particularized herein.

59.  Furthermore, Defendants Stemberg, Hanaka, Wilson, Sargent, Hickey, Mahoney, Mayerson, Nachbor, Anderson, Barnes, Blank, Burton, Moriarity, Nakasone, Trust and Walsh signed Staples's financial statements for 1994 to 2006, which materially understated the Company's compensation expense and materially overstated its net income. In addition, Defendants Stemberg, Vassalluzzo, Parneros, Sargent, Hickey, Mahoney, Hoyt, Levitan, Gentry, Lewis, Harsant, Bingleman, Crosier, Peters, Light, Doody, VanWoerkom, Moore, Ellinger, Mayerson, Anderson, Burton, Moriarity, Nakasone, Trust and Walsh sold over $446.5 million of Staples stock based upon their knowledge of material non-public information regarding the undisclosed practice of backdating stock options in violation of federal securities laws.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

60.  By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner. The Individual

Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

61.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

62.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the Individual Defendants were required to, among other things:

  a. exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

  b. exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

  c. exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits or other financial information concerning the financial condition of the Company;

       d.      exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

       e.      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

63.    The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required to:

      (1)    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

      (2)    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

           (a)    transactions are executed in accordance with management's general or specific authorization; and

           (b)    transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

64.    Staples's Audit Committee Charter provides that the Audit Committee shall, among other things,

       a.      Review and discuss with the Company's management and independent auditor the Company's audited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and the matters about which Statement on Auditing Standards No. 61 requires discussion;

       b.      Consider whether it will recommend to the Board of

        Directors that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K;

c.    Prepare for inclusion in a proxy or information statement of the Company relating to an annual meeting of security holders at which directors are to be elected, the report described in Item 306 of Regulation S-K;

d.    Discuss with the Company's management and independent auditor the Company's quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;"

e.    Oversee the Company's internal accounting controls and the Company's disclosure controls and procedures on behalf of the Board of Directors;

f.    Receive and review the reports of the CEO and CFO required by Rule 13a-14 of the Securities Exchange Act; and

g.    Provide input to the Compensation Committee on the evaluation of the Company's financial management personnel.

65.    Notably, Staples's Compensation Committee Charter provides that the main functions of the Compensation Committee, among other things, are:

a.    *administer*, periodically review and make recommendations to the Board with respect to employee benefit plans, including *all incentive-compensation plans and equity-based plans*; and

b.    exercise all rights, authority and functions of the Board under all of the Company's stock option, stock incentive, employee stock purchase and other equity-based plans, including without limitation, the *authority to interpret the terms thereof, to grant options thereunder and to make stock awards thereunder.* (Emphasis added).

## FACTUAL ALLEGATIONS

### Backdating of Stock Option Grants to the Individual Defendants

66. Pursuant to the terms of the Company's shareholder-approved stock option plans, including all versions of the 1987 Stock Option Plan and the 1992 Equity Incentive Plan (collectively, the "Plans"), all Staples stock option grants must have an exercise price equal to the "fair market value of the common stock on the date of grant" or must "not be less than 100% of the fair market value of Staples' common stock at the date of grant," where "fair market value" is "the last reported sale price per share of such series of Common Stock on the Nasdaq National Market on the date of grant."

67. Pursuant to Accounting Principles Board Opinion No. 25 ("APB 25"), "Accounting for Stock Issued to Employees," the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense.

68. Pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

69. From 1994 to 2003, the Compensation Committee, which, according to the Company's proxy statements filed with the SEC from 1995 to 2004, was responsible for "set[ting] the compensation levels of executive officers (subject to review by Board of Directors), provid[ing] recommendations to the Board regarding compensation programs, *administer[ing] Staples' equity incentive, stock purchase and other employee benefit plans and authoriz[ing] option and restricted stock grants . ..,*" with the knowledge and approval of the other members of the Board, knowingly and deliberately violated the terms of the Plans, APB 25 and Section 162(m) by knowingly and deliberately backdating grants of stock options to make it appear as though the grants were made on dates when the market price of Staples stock was lower than the market price on the actual grant dates, thereby unduly benefiting the recipients of the backdated stock options.

70. The members of the Board who were not on the Compensation Committee had actual knowledge of the backdating and knew that it violated the terms of the Plans, APB 25 and Section 162(m). All of the Board members knew that the publicly reported grant dates and statements that the Company followed APB 25 and granted stock options with exercise prices not less than the fair market value of Staples stock on the date of grant were false because the grants were, in fact, backdated. Furthermore, the entire Board knowingly and deliberately approved the stock option backdating scheme with knowledge of its consequences, *e.g.*, its effects on Staples's financial statements.

71. Dating back to 1994, with the knowledge and approval of the full Board, the Compensation Committee granted certain stock options to the Individual Defendants backdated to coincide with dates having particularly low closing stock prices.

72. On September 23, 1994, the Company purportedly granted at least 464,250 stock

options to some of Staples's most highly compensated executives backdated to coincide with the *lowest closing stock price of the month*, as shown below:



| Purported Date of Grant | Name | Number of Options[2] | Exercise Price | Adjusted Number of Options | Adjusted Exercise Price |
|---|---|---|---|---|---|
| 09/23/94 | Stemberg | 213,750 | $19.75 | 1,082,452 | $3.90 |
| | Hanaka | 75,000 | $19.75 | 379,808 | $3.90 |
| | Wilson | 58,500 | $19.75 | 296,250 | $3.90 |
| | Pepi | 37,500 | $19.75 | 189,904 | $3.90 |
| | Vassalluzzo | 37,500 | $19.75 | 189,904 | $3.90 |
| | Parneros | at least 4,500 | $19.75 | at least 22,788 | $3.90 |
| | Sargent | at least 37,500 | $19.75 | at least 189,904 | $3.90 |

73.  On March 1, 1996, the Company purportedly granted at least 3,375 stock options to Patrick Hickey, the Company's Vice President - Financial Planning, Analysis & Reporting, backdated to coincide with the *lowest closing stock price of the month*, as shown below:

---

[2] Where the total number of options is unknown, *i.e.*, where the phrase "at least" is utilized, the stock option grant was not reported in any of the Company's proxy statements filed with the SEC, but were first disclosed in Form 4 filings, which only included the number of stock options pursuant to the grant that were exercised and left unexercised on the transaction date.