## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

| | | |
|---|---|---|
| ANN WINTERS, Derivatively on Behalf of Nominal Defendant STAPLES, INC., | ) ) ) ) | No. 07 CA 10193 WGY **(Consolidated Action)** |
| Plaintiff, | ) ) | |
| v. | ) ) ) | **AMENDED SHAREHOLDER DERIVATIVE COMPLAINT** |
| THOMAS G. STEMBERG, MARTIN E. HANAKA, JOHN B. WILSON, LOUIS R. PEPI, JOSEPH S. VASSALLUZZO, DEMOS PARNEROS, RONALD L. SARGENT, PATRICK HICKEY, JOHN J. MAHONEY, SUSAN S. HOYT, JEFFREY L. LEVITAN, RICHARD R. GENTRY, JEANNE B. LEWIS, EDWARD C. HARSANT, JOHN C. BINGLEMAN, DAVID B. CROSIER, JAMES C. PETERS, BRIAN T. LIGHT, JOSEPH G. DOODY, JACQUES LEVY, JACK VANWOERKOM, ROBERT J. MOORE, DEBORAH G. ELLINGER, ROBERT K. MAYERSON, JEFFREY E. NACHBOR, BASIL L. ANDERSON, BRENDA C. BARNES, ARTHUR M. BLANK, MARY ELIZABETH BURTON, ROWLAND T. MORIARTY, ROBERT C. NAKASONE, MARTIN TRUST and PAUL F. WALSH, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | **JURY TRIAL DEMANDED** |
| STAPLES, INC., | ) ) ) | |
| Nominal Defendant. | ) ) | |

_____

Plaintiffs Ann Winters ("Winters") and Laborers' International Union of North America

National (Industrial) Pension Fund ("Laborers" and, collectively, the "Plaintiffs"), by the

undersigned attorneys, submit this Amended Shareholder Derivative Complaint (the "Amended Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholders' derivative action brought for the benefit of nominal defendant Staples, Inc. ("Staples" or the "Company") against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, statutory violations and other violations of law.

2.      This action seeks redress for the harm done to Staples, and indirectly to its stockholders, resulting from the self-dealing of certain of the Company's top executives and directors who breached their fiduciary duties of loyalty and good faith to the Company by intentionally manipulating Staples stock option grants between 1994 and 2003.  As a result of their misconduct, certain defendants have secured a huge windfall for themselves at the expense of Staples and caused the misstatement of Staples' financial results from the Company's fiscal year 1994 through the present, which in turn caused the Company to record a $10.7 million compensation expense during the third quarter of 2006 to "reflect the cumulative impact of accounting errors due to the use of incorrect measurement dates" with respect to the Company's granting of stock options from 1997 through 2006.

3.      For at least ten years, Staples' directors, together with its top officers, backdated stock option grants in order to exercise the stock options at a lower strike price, thus pocketing more money than they were otherwise entitled to receive.  A stock option is the right to purchase a stock for a specified period of time at a fixed price, called the "exercise price" or "strike price." The exercise price is generally fixed to the market price of the stock on the date of grant.  If the stock's market price exceeds the exercise price, the option holder may exercise the stock option,

by purchasing the stock from the Company at the exercise price, and resell it at the higher market price, profiting from the difference.

4.      When the grant date of a stock option is manipulated to an earlier date on which the stock closed at a lower price – *i.e.*, when the stock option is "backdated" – the grantee pays less for the stock and the corporation, the counterparty to the stock option grant, receives less when the stock option is exercised.  When stock options are backdated in this manner for the benefit of insiders (as they were in this case), the stated purposes behind the Company's stock option plans – encourage retention and promote identity of interest with Staples' stockholders – is undermined to the detriment of the Company and its shareholders, because the stock options are already "in the money"[1] when granted.  Backdating stock option grants thus represents a direct and continuing waste of valuable corporate assets.

5.      The practice of backdating stock options was first publicly disclosed on March 18, 2006, when *The Wall Street Journal* published an article entitled "The Perfect Payday," in which it described stock option backdating practices by a number of companies at which executives had achieved extremely fortuitous stock option paydays, the likelihood of which defied random chance. *The Wall Street Journal*, together with finance professors Eric Lie, of the Tippie College of Business at the University of Iowa, David Yermack, of New York University Stern School of Business, and Professor John Emerson, a statistician at Yale University, studied patterns of stock option grants at certain companies, calculating the probability of such patterns occurring randomly; they concluded that the odds, in many cases, were extremely long.

6.      This practice of backdating stock options, though widespread, remained virtually

---

[1]"In the money" refers to when the exercise price of a stock option is below the market price of the underlying stock. *See* infra.

undetected until such academic research revealed patterns of stock option grants that could not be explained by chance.  These studies noted the frequency with which stock option grants occurred just after a drop in stock price and immediately before the price rose, often at the lowest price of the year or of another fiscal period.  Such timing could not be statistically explained by random selection of grant dates.  One study hypothesized that the dates of the grants had been selected retroactively.  Such retroactive dating, or "backdating" would permit the grantor to select the most advantageous price for the stock option and in effect create an "in-the-money" stock grant (one in which the actual stock price exceeds the option price on the day granted), that would appear as if it was granted while the stock price was low.

7.     Since companies are required to report "in-the-money" grants as compensation to the recipient and as a charge to the corporation, the practice of backdating would provide a means to confer additional stock value, or compensation, to officers and employees that was not detectable, thereby permitting the Company to conceal the additional compensation and forego reporting or recording the charge.

8.     When the grant date of a stock option is manipulated to an earlier date on which the stock closed at a lower price – *i.e.* when the stock option is "backdated" – the grantee pays less for the stock and the corporation, which sells the stock to the grantee at the option price, receives less when the stock option is exercised.

9.     When stock options are backdated in this manner for the benefit of insiders (as they were in this case), the stated purpose behind a stock option plan – to strengthen the Company's ability to hire and retain key employees and motivate such employees to remain focused on long-term stockholder value performance – is undermined to the detriment of the Company and its shareholders.  Backdated stock options are already "in-the-money" at the time

they are granted, and the directors and officers deliberately cause the Company to mislead both its shareholders and governmental regulators by falsely claiming in its regulatory filings that the stock options were actually granted on the stated date.

10.     The academic research did not identify specific companies that had engaged in these practices, although it triggered increased scrutiny by the Securities and Exchange Commission ("SEC") and other government officials.

11.     For example, on September 6, 2006, the United States Senate Committee on Finance ("Finance Committee") held a hearing on "Executive Compensation: Backdating to the Future/Oversight of current issues regarding executive compensation including backdating of stock options; and tax treatment of executive compensation, retirement and benefits." At the hearing, Former Finance Committee Chairman, Senator Chuck Grassley, in his opening statement, stated: "[options backdating] is behavior that, to put it bluntly, is disgusting and repulsive.  It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get mine.' . . . [S]hareholders and rank-and-file employees were ripped off by senior executives who rigged stock option programs – through a process called 'back-dating' – to further enrich themselves. And as we have found far too often in corporate scandals of recent years, boards of directors were either asleep at the switch, or in some cases, willing accomplices themselves. . . ."

12.     To achieve Staples' stated goal of strengthening the Company's ability to attract and retain key employees who are expected to contribute to the Company's growth and success, Staples' shareholder-approved stock option plans provide that the exercise price of a stock option cannot be "***less than the fair market value of the common stock on the date of grant or at an exercise price not less than 110% of the fair market value in the case of incentive stock options***

*granted to optionees holding more than 10% of the voting power of Staples*."  However, the Individual Defendants blatantly violated this and other provisions of the Company's stock option plans by backdating Staples stock options in order to illegally maximize the grantees' profits.  As such, and as detailed below, the Individual Defendants' acts were *ultra vires* – unauthorized and beyond the scope of power granted to them.

13.    The Individual Defendants' backdating at Staples first came to light on November 14, 2006, when Staples revealed that the Company conducted a review of its historical stock option granting practices during the period of 1997 to the present and **admitted** that previous stock options were backdated.  Specifically, Staples stated:

> Q3 Stock Based Compensation Correction
>
> During the third quarter of 2006, the company and its Audit Committee, assisted by outside counsel, conducted a review of the company's historical stock option granting practices during the period from 1997 to the present. Based on the results of the review, *the company has recorded a $10.8 million expense ($8.6 million net of taxes) in the third quarter to reflect the cumulative impact of accounting errors due to the use of incorrect measurement dates*, without restating any historical financial statements. The Company has concluded that the use of incorrect measurement dates was not the result of intentional wrongdoing and has taken steps to improve the controls over its option granting processes. (Emphasis added.).

14.    Moreover, on December 22, 2006, Staples identified the July 1, 2003 stock option grant as a specific grant requiring a corrected exercise price- a corrected price which falls on July 10, 2003, 9 days **after** the original purported grant date.

15.    By backdating stock options, as detailed herein, the members of the Board were able to conceal that Staples was materially under-reporting the Company's compensation expenses and was materially overstating the Company's net income and earnings for at least fiscal years 1994 through 2003.  In addition to being unjustly enriched by the mere receipt of

such backdated options, certain of the Individual Defendants also collectively realized millions of dollars in illicit proceeds through the exercise of these illegally backdated options grants and subsequent sales of Staples stock.

16.     By contrast, Staples has suffered, and will continue to suffer, significant financial and non-monetary damages and injuries, several of which were identified in a report issued by the Center for Financial Research and Analysis on May 16, 2006, entitled "Options Backdating – Which Companies Are at Risk?":

- SEC investigation risk – The SEC has begun informal investigations at many companies in recent months and has also begun to call for improved disclosures around all areas of executive compensation.

- Accounting restatement risk – Some companies which have admitted backdating options have accompanied those admissions with financial restatements impacting both the balance sheet and earnings.

- Tax/Cash implications – The change in options from the practice of options backdating may force some companies to restate tax positions for the years in question, which could result in an obligation to pay back taxes.

- Management credibility risk – If a reputable management team is found to have repeatedly backdated options, thereby enriching themselves at the expense of shareholder, the reputation of management (and the related stock premium for superior management) could take a hit.

17.     As alleged in detail herein, in gross breach of their fiduciary duties as officers and/or directors of Staples, the Individual Defendants colluded with one another to:

a.     improperly backdate hundreds of thousands of grants of Staples stock options to Staples's executive officers and directors, in violation of the Company's shareholder-approved stock option plans;

b.     improperly record and account for the backdated stock options, in violation of Generally Accepted Accounting Principles ("GAAP");

c.     improperly take tax deductions based on the backdated

stock options, in violation of Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"); and

d.     produce and disseminate to Staples shareholders and the market false financial statements and other SEC filings that improperly recorded and accounted for the backdated stock option grants and concealed the improper backdating of stock options.

18.     As a result of the Individual Defendants' egregious misconduct, Staples has sustained significant damages, and the recipients of the backdated Staples stock options have garnered millions of dollars in unlawful proceeds.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

20.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

21.     Plaintiff Ann Winters is, and was at all relevant times, a shareholder of nominal defendant Staples. Plaintiff Winters purchased Staples common stock in February 1999, has continuously held stock in Staples throughout the wrongs complained of and continues to hold

her shares of Staples common stock.  Plaintiff Winters is a citizen of the Commonwealth of Virginia.

22.     Plaintiff Laborers' International Union of North America National (Industrial) Pension Fund is a shareholder of nominal defendant Staples.  Plaintiff Laborers purchased Staples common stock in September 2003, and has held stock in Staples continuously since that time to the present.  Plaintiff Laborers, a citizen of the District of Columbia, is a defined benefit pension plan serving more than 35,000 active employees, approximately 7,200 pensioners, and over 10,000 employees who have left coverage with vested rights.  The Fund covers workers in a broad range of employment, including professional, dental, manufacturing, service contracts, federal government, public sector and others in various job classifications.

23.     Nominal defendant Staples is a Delaware corporation with its principal executive offices located at Five Hundred Staples Drive, Framingham, Massachusetts 01702.  According to its public filings, Staples is the world's leading office products company.

## Officer Defendants

24.     Defendant Thomas G. Stemberg ("Stemberg") founded the Company and has served as the Company's Chairman Emeritus of the Board since March 2005.  Stemberg also served as the Company's Chairman of the Board from February 1988 to March 2005, as a part-time associate and Non-Executive Chairman from February 2004 to March 2005, as Executive Chairman from February 2002 to January 2004, and as Chief Executive Officer from January 1986 to February 2002.

25.     Defendant Martin E. Hanaka ("Hanaka") served as the Company's President and Chief Operating Officer from August 1994 to October 1997, and as a Director from May 1996 to October 1997.

26.     Defendant John B. Wilson ("Wilson") served as the Company's Executive Vice President - Finance & Strategy and Chief Financial Officer from November 1992 to in or about 2000.

27.     Defendant Louis R. Pepi ("Pepi") served as the Company's Executive Vice President - Human Resources from August 1994 to in or about May 1995, as President of the "Staples, The Office Superstore" division from April 1993 to August 1994, and as Executive Vice President - Operations from October 1990 to April 1993.

28.     Defendant Joseph S. Vassalluzzo ("Vassalluzzo") served as the Company's Vice Chairman from December 1999 to in or about 2004 and in various other capacities since he joined the Company in September 1989, including President, Realty and Development from October 1997 to December 1999, as President - Staples Realty from September 1996 to October 1997, as Executive Vice President - Growth and Development from November 1993 to September 1996, and as Executive Vice President - Growth and Support Services from April 1993 to November 1993.

29.     Defendant Demos Parneros ("Parneros") has served as the Company's President - U.S. Retail Stores since April 2002.  Prior to April 2002, Parneros served in various capacities since joining Staples in October 1987, including Senior Vice President of Operations from March 1999 to March 2002 and Vice President of Operations from September 1996 to February 1999.

30.     Defendant Ronald L. Sargent ("Sargent") has served as the Company's Chief Executive Officer since February 2002, as Chairman of the Board since March 2005 and as a Director since December 1999.  Sargent also served as the Company's President from November 1998 to March 2005, as Chief Operating Officer from November 1998 to February 2002, as

President - North American Operations from October 1997 to November 1998, as President - Staples Contract & Commercial from June 1994 to October 1997, and in various other capacities since joining the Company in March 1989.

31.     Defendant Patrick Hickey ("Hickey") served as the Company's Senior Vice President - Corporate Controller from November 1999 to in or about 2002, as Vice President and Treasurer from September 1997 to November 1999, as Vice President - Financial Planning, Analysis & Reporting from January 1996 to September 1997, as Director of Financial Planning from October 1994 to January 1996, and in various other capacities since joining Staples in June 1993.

32.     Defendant John J. Mahoney ("Mahoney") has served as the Company's Vice Chairman and Chief Financial Officer since January 2006.  Mahoney also served as the Company's Executive Vice President, Chief Administrative Officer and Chief Financial Officer from October 1997 to January 2006, and as Executive Vice President and Chief Financial Officer from September 1996 to October 1997.

33.     Defendant Susan S. Hoyt ("Hoyt") has served as the Company's Executive Vice President - Human Resources since July 1996.

34.     Defendant Jeffrey L. Levitan ("Levitan") served as the Executive Vice President - Strategy/Business Development for Staples.com from September 1999 to in or about 2000, as Senior Vice President - Strategy, New Business Development and Staples.com from November 1998 to September 1999, and as Senior Vice President - Strategic Planning and Business Development from August 1996 to November 1998.

35.     Defendant Richard R. Gentry ("Gentry") served as the Company's Executive Vice President - Merchandising & Supply Chain Management from January 2001 to in or about

2002 and as Executive Vice President - Merchandising from February 1996 to December 2000.

36.     Defendant Jeanne B. Lewis ("Lewis") served as President - Staples.com from September 1999 to in or about 2002, as Executive Vice President - Marketing from November 1998 to September 1999, as Senior Vice President - Marketing from February 1998 to November 1998, as Senior Vice President - Marketing and Small Business from April 1997 to February 1998, as Vice President/Divisional Merchandise Manager from 1996 to April 1997, as Director of Operations and Director of Sales and Marketing from 1994 to 1996, and in various other capacities since she joined Staples in April 1993.

37.     Defendant Edward C. Harsant ("Harsant") served as the Company's President - North American Stores from August 2000 to in or about 2002 and as President - The Business Depot, Ltd. from January 1995 to August 2000.

38.     Defendant John C. Bingleman ("Bingleman") served as the Company's President - Staples International from February 1997 to June 2000 and as President - North American Superstores from August 1994 to February 1997.

39.     Defendant David B. Crosier ("Crosier") served as the Company's Executive Vice President - Supply Chain Management from June 1998 to in or about 2000.

40.     Defendant James C. Peters ("Peters") served as the Company's President - U.S. Stores from March 1998 to in or about 2000 and as Executive Vice President - U.S. Stores from September 1997 to March 1998.

41.     Defendant Brian T. Light ("Light") has served as the Company's Chief Information Officer since January 2006.  Light also served as the Company's Executive Vice President, Staples Business Delivery from January 2002 to January 2006, as Executive Vice President and Chief Information Officer from February 2000 to January 2002, and as Senior

Vice President and Chief Information Officer from February 1998 to February 2000.

42.     Defendant Joseph G. Doody ("Doody") has served as the Company's President - Staples North American Delivery since March 2002.  Doody also served as the Company's President - Staples Contract & Commercial from November 1998 to March 2002.

43.     Defendant Jacques Levy ("Levy") served as the Company's President - Staples International from April 2000 to September 2003.

44.     Defendant Jack VanWoerkom ("VanWoerkom") has served as the Company's Executive Vice President, General Counsel and Secretary since March 2003.  VanWoerkom also served as the Company's Senior Vice President, General Counsel and Secretary from March 1999 to March 2003.

45.     Defendant Robert J. Moore ("Moore") served as the Company's Executive Vice President - Marketing from November 1999 to in or about 2001.

46.     Defendant Deborah G. Ellinger ("Ellinger") served as the Company's Senior Vice President - Strategic Planning & New Business Development from June 1999 to November 2001.

47.     Defendant Robert K. Mayerson ("Mayerson") served as the Company's Senior Vice President and Treasurer from October 2002 to in or about 2004, as Senior Vice President and Corporate Controller from September 1997 to 1999, as Senior Vice President and Treasurer from April 1997 to September 1997, and as Vice President and Treasurer from August 1993 to April 1997.

48.     Defendant Jeffrey E. Nachbor ("Nachbor") served as the Company's Senior Vice President, Corporate Controller from April 1993 to February 2005.

49.     Collectively, defendants Stemberg, Hanaka, Wilson, Pepi, Vassalluzzo, Parneros,

13

Sargent, Hickey, Mahoney, Hoyt, Levitan, Gentry, Lewis, Harsant, Bingleman, Crosier, Peters, Light, Doody, Levy, VanWoerkom, Moore, Ellinger, Mayerson and Nachbor are referred to herein as the "Officer Defendants."

### Director Defendants

50.     Defendant Basil L. Anderson ("Anderson") has served as a Director of the Company since 1997.  Anderson also served as a member of the Audit Committee of the Board ("Audit Committee") from 1997 to 2001, including as Chairman from 1998 to 2001.  Anderson also served as the Company's Vice Chairman of the Board from September 2001 to March 2006.

51.     Defendant Brenda C. Barnes ("Barnes") served as a Director of the Company from June 2002 to September 2007 and as a member of the Compensation Committee of the Board ("Compensation Committee") from 2003 to September 2007.  As a member of the Compensation Committee, Barnes approved the stock option grant to Company executives on July 1, 2003.  Barnes also served as a member of the Audit Committee in 2002 and 2003.

52.     Defendant Arthur M. Blank ("Blank") has served as a Director of the Company since 2001 and as a member of the Compensation Committee since 2001.  As a member of the Compensation Committee, Blank approved the stock option grants to Company executives on December 4, 2001 and July 1, 2003.

53.     Defendant Mary Elizabeth Burton ("Burton") has served as a Director of the Company since June 1993 and as a member of the Audit Committee since at least 1994.

54.     Defendant Rowland T. Moriarty ("Moriarty") has served as a Director of the Company since March 1986.

55.     Defendant Robert C. Nakasone ("Nakasone") has served as a Director of the Company since January 1986.  Nakasone also served as a member of the Compensation

Committee from at least 1994 to 2002, including as Chairman from at least 1994 to 1999.  As a member of the Compensation Committee, Nakasone approved the stock option grants to Company executives on September 23, 1994, March 1, 1996, November 1, 1996, August 28, 1997, July 1, 1998, November 30, 1998, December 1, 1998, June 6, 2000, August 1, 2000 and December 4, 2001.

56.    Defendant Martin Trust ("Trust") has served as a Director of the Company since June 1987.  Trust also served as a member of the Compensation Committee from at least 1994 to 1995 and from 1996 to 2003, including as Chairman from 1999 to 2003.  As a member of the Compensation Committee, Trust approved the stock option grants to Company executives on September 23, 1994, March 1, 1996, November 1, 1996, August 28, 1997, July 1, 1998, November 30, 1998, December 1, 1998, June 6, 2000, August 1, 2000, December 4, 2001 and July 1, 2003.

57.    Defendant Paul F. Walsh ("Walsh") has served as a Director of the Company since December 1990 and as a member of the Audit Committee since at least 1994, including serving as Chairman from at least 1994 to 1998 and since 2001.

58.    Collectively, Officer Defendant Sargent and defendants Anderson, Barnes, Blank, Burton, Moriarty, Nakasone, Trust and Walsh are referred to herein as the "Director Defendants."

59.    Collectively, the Officer Defendants and Director Defendants are referred to herein as the "Individual Defendants."

60.    As executive officers and/or Board members, the Individual Defendants approved and received the backdated Staples stock options at issue in this case.  The Individual Defendants assisted in the preparation of Staples's annual and quarterly reports from 1994 through 2004 and

15

reviewed, approved and/or helped to prepare each proxy statement Staples filed from 1995 to 2004, which falsely represented that Staples stock options were granted at the fair market value per share of common stock on the date of the grant, in order to conceal the existence of and their participation in the Individual Defendants' integrated and continuous scheme to backdate (and conceal the backdating of) Staples stock option grants.  As a result of the foregoing, the Individual Defendants personally and financially benefited from the backdated Staples stock option grants particularized herein.

61.     Furthermore, Defendants Stemberg, Hanaka, Wilson, Sargent, Hickey, Mahoney, Mayerson, Nachbor, Anderson, Barnes, Blank, Burton, Moriarty, Nakasone, Trust and Walsh signed Staples's financial statements for 1994 to 2006, which materially understated the Company's compensation expense and materially overstated its net income.  In addition, Defendants Stemberg, Vassalluzzo, Parneros, Sargent, Hickey, Mahoney, Hoyt, Levitan, Gentry, Lewis, Harsant, Bingleman, Crosier, Peters, Light, Doody, VanWoerkom, Moore, Ellinger, Mayerson, Anderson, Burton, Moriarty, Nakasone, Trust and Walsh sold over $446.5 million of Staples stock based upon their knowledge of material non-public information regarding the undisclosed practice of backdating stock options in violation of federal securities laws.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

62.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and

its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

63.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

64.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

    a.    exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

    b.    exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

    c.    exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits or other financial information concerning the financial condition of the Company;

    d.    exercise good faith in ensuring that the Company's financial statements were prepared in accordance with GAAP; and

17

e.     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

65.     The Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.   According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing and reporting financial data, a corporation must establish an internal accounting control structure.   Among other things, the Individual Defendants were required to:

(1)     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(a)     transactions are executed in accordance with management's general or specific authorization; and

(b)     transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

66.     Staples's Audit Committee Charter provides that the Audit Committee shall, among other things,

a.     Review and discuss with the Company's management and independent auditor the Company's audited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and the matters about which Statement on Auditing Standards No. 61 requires discussion;

b.     Consider whether it will recommend to the Board of Directors that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K;

18

c.     Prepare for inclusion in a proxy or information statement of the Company relating to an annual meeting of security holders at which directors are to be elected, the report described in Item 306 of Regulation S-K;

d.     Discuss with the Company's management and independent auditor the Company's quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;"

e.     Oversee the Company's internal accounting controls and the Company's disclosure controls and procedures on behalf of the Board of Directors;

f.     Receive and review the reports of the CEO and CFO required by Rule 13a-14 of the Securities Exchange Act; and

g.     Provide input to the Compensation Committee on the evaluation of the Company's financial management personnel.

67.    Notably, Staples' Compensation Committee Charter provides that the main functions of the Compensation Committee, among other things, are:

a.     ***administer***, periodically review and make recommendations to the Board with respect to employee benefit plans, including ***all incentive-compensation plans and equity-based plans***; and

b.     exercise all rights, authority and functions of the Board under all of the Company's stock option, stock incentive, employee stock purchase and other equity-based plans, including without limitation, the ***authority to interpret the terms thereof, to grant options thereunder and to make stock awards thereunder***. (Emphasis added).

## **FACTUAL ALLEGATIONS**

### **Background of the Stock Option Backdating Scandal**

68.    Under accounting rules in effect prior to 2004, public companies in the United States were permitted to grant stock options to employees without recording an expense, so long

as the option's strike price was at or above the market's closing price for the stock on the day the options were granted.  If the option granted was priced below the market price on the date granted, known as an "in-the-money" option grant, SEC regulations required that any publicly traded company recognize and record the difference as a compensation expense in its financial statements.  *See, e.g.*, APB 25, superseded in 2004 by FAS 123(R).[2]  Accounting rules also required that companies recognize the same compensation expense if "in-the-money" options were granted to non-employees.  Thus while "in-the-money" stock options are more valuable to those to whom they are granted, the additional expenses, if disclosed, reduce the total amount of net income reported to shareholders of a publicly traded company.

69.     In addition, pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's most highly compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

---

[2] Pursuant to Accounting Principles Board Opinion No. 25 ("APB 25), the applicable GAAP provision at the time of the stock option grants enumerated herein, if the market price on the date of grant exceeds the exercise price of the options, the Company must recognize the difference as an expense.

70.     Since the date of *The Wall Street Journal* article which first revealed the illegal practice of backdating stock options, more than 130 companies have reported internal and/or governmental investigations of their backdating practices.   *Perfect Payday Options Scorecard*, *The       Wall       Street       Journal*       (updated       regularly,       available       at http://online.wsj.com/public/resources/documents/info-optionsscore06-full.html).

71.     Revelations of backdated stock options have been made by companies across several business sectors and geographic regions.  A disproportionate number of these revelations, however, have come from technology companies in Silicon Valley, where stock options are frequently used to attract employees and increasingly lavished upon executives.  Rank and file employees who received backdated options have now found themselves subject to unforeseen tax liabilities and, in some instances, barred from exercising their own vested securities.  As reported by the San Jose Mercury News:

> Across Silicon Valley and the nation, hundreds of thousands of workers who played no role in manipulating options nonetheless could pay a price, from lost stock options and lost investment opportunities to looming tax bills.  And dozens of companies have imposed indefinite "blackout" periods …. While companies struggle to restate past earnings and report current financial results. Mark Schwanhausser, *Average Worker Takes A Hit: Tax Bill Headaches Looming For Rank-and-File*, San Jose Mercury News, January      29,      2007,      available      online      at http://www.mercurynews.com/search/ci_5110094.

72.     As the scrutiny has intensified, backdating has been revealed not only as a practice to maximize the grant recipients' gain, while concealing company expenses, but also as a tax avoidance vehicle for some executives.  Reporting on an analysis written by an economist at the SEC, the San Jose Mercury News reported, "[i]n a new wrinkle in the scandal over backdating stock options, an analyst has found evidence that some executives manipulated the exercise dates of their options in order to cheat on their taxes."  Marcy Gordon, SEC: Backdating

Done to Avoid Paying More Taxes, San Jose Mercury News, December 13, 2006, available online at http://www.mercurynews.com/search/ci_4831931.

### Backdating of Stock Option Grants at Staples

73.     Like the stock option grants examined by *The Wall Street Journal*, the pattern of option grants identified herein is more than randomly fortuitous, and the more likely reason for the extraordinary pattern is that the stock options were improperly backdated.

74.     During the time that the Individual Defendants approved or received backdated stock options, the stock option plans in effect at Staples were the 1987 Stock Option Plan (which was in effect until 1997) and the 1992 Equity Incentive Plan (collectively, the "Plans").

### The 1987 Stock Option Plan (the "1987 Plan")

75.     According to the Company's proxy statements, options granted under the 1987 Plan were made "primarily to recruit or promote officers and senior managers" of the Company. Options granted under the 1987 Plan may be either "incentive stock options" or "non-qualified stock options."

76.     According to the Company's proxy statements, the 1987 Plan was to be administered by the Board.

77.     According to the Company's proxy statements, the exercise price for options granted under the 1987 Plan "may not be less than 100% of the fair market value of the Company's Common Stock on the date such option is granted."

### The 1992 Equity Incentive Plan (the "1992 Plan")

78.     According to the Company's proxy statements, the purpose of the 1992 Plan was to "ensure that the Company may continue to attract and retain key employees." Options granted under the 1992 Plan may be either "incentive stock options" or "non-qualified stock options."

79.     According to the Company's proxy statements, the 1992 Plan was to be administered by the Board, which also had the option of delegating "any or all of its powers under the Plan to a committee appointed by the Board of Directors."

80.     According to the Company's proxy statements, the exercise price for options granted under the 1992 Plan "shall in no event be less than 100% of the fair market value of [the Company's Common Stock], as determined by the Board of Directors, at the time of grant of such option," where fair market value was defined as "the last reported sale price per share of such series of Common Stock on the Nasdaq National Market on the date of grant."

81.     Pursuant to Accounting Principles Board Opinion No. 25 ("APB 25"), "Accounting for Stock Issued to Employees," the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense.

82.     Pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly-compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals; (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

83.     From 1994 to 2003, the Compensation Committee, which, according to the

Company's proxy statements filed with the SEC from 1995 to 2004, was responsible for "set[ting] the compensation levels of executive officers (subject to review by Board of Directors), provid[ing] recommendations to the Board regarding compensation programs, *administer[ing] Staples' equity incentive, stock purchase and other employee benefit plans and authoriz[ing] option and restricted stock grants* . ..," with the knowledge and approval of the other members of the Board, knowingly and deliberately violated the terms of the Plans, APB 25 and Section 162(m) by knowingly and deliberately backdating grants of stock options to make it appear as though the grants were made on dates when the market price of Staples stock was lower than the market price on the actual grant dates, thereby unduly benefiting the recipients of the backdated stock options.

84.     The Director Defendants who were not on the Compensation Committee had actual knowledge of the backdating and knew that it violated the terms of the Plans, APB 25 and Section 162(m).  All of the Director Defendants knew that the publicly reported grant dates and statements that the Company followed APB 25 and granted stock options with exercise prices not less than the fair market value of Staples stock on the date of grant were false because the grants were, in fact, backdated.  Furthermore, each of the Director Defendants knowingly and deliberately approved the stock option backdating scheme with knowledge of its consequences, *e.g.*, its effects on Staples's financial statements.

85.     Dating back to 1994, with the knowledge and approval of the full Board, the members of the Compensation Committee granted stock options to certain of the Individual Defendants backdated to coincide with dates having particularly low closing stock prices.  Of the fifty-one discretionary stock option grants made between 1994 and July 1, 2003, *eleven* were backdated- eight of the grants were purportedly made at or near one of the lowest prices of the

month, two were made at or near one of the ***lowest prices of the quarter*** and the remaining grant preceded a substantial rise in the price of the Company's stock.

**Fiscal Year 1994 Option Grants (Fiscal Year ended January 28, 1995)**

86.     On September 23, 1994, the Compensation Committee, of which Defendants Nakasone and Trust were members, purportedly granted stock options to Defendants Stemberg, Hanaka, Wilson, Pepi, Vassalluzzo, Parneros, Sargent at an exercise price of $2.60[3] - the ***lowest closing stock price of the month***.

87.     The Compensation Committee, of which Defendants Nakasone and Trust were members, had the sole authority to choose the date, and, in fact, did choose the date on which this stock option was granted.   Nakasone and Trust approved this grant on a date after the reported grant date and knowingly used hindsight to pick the date when Staples' stock was at a monthly low.   Nakasone and Trust knew that the Plans required them to use the fair market value on the actual date of grant and knew that backdating to a date with a lower price violated the Plans.

---

[3] All stock prices have been adjusted to reflect the Company's 3-for-2 stock splits effective October 31, 1994, July 25, 1995, March 26, 1996, February 2, 1998, January 29, 1999 and April 18, 2005.

## September 1994



## 1994 Fiscal Year



| Purported Date of Grant | Name | Number of Options[4] | Exercise Price | Adjusted Number of Options | Adjusted Exercise Price |
|---|---|---|---|---|---|
| 09/23/94 | Stemberg | 213,750 | $19.75 | 1,623,678 | $2.60 |
| | Hanaka | 75,000 | $19.75 | 569,712 | $2.60 |
| | Wilson | 58,500 | $19.75 | 444,250375 | $2.60 |
| | Pepi | 37,500 | $19.75 | 284,856 | $2.60 |
| | Vassalluzzo | 37,500 | $19.75 | 284,856 | $2.60 |
| | Parneros | at least 4,500 | $19.75 | at least 34,182 | $2.60 |
| | Sargent | at least 37,500 | $19.75 | at least 284,856 | $2.60 |

**Fiscal Year 1996 Option Grants (Fiscal Year ended February 1, 1997)**

88.     On March 1, 1996, the Compensation Committee, of which Defendants Nakasone and Trust were members, purportedly granted at least 3,375 stock options to Patrick Hickey, the Company's Vice President - Financial Planning, Analysis & Reporting, at an exercise price of $5.09 - the ***lowest closing stock price of the month***.

89.     The Compensation Committee, of which Defendants Nakasone and Trust were members, had the sole authority to choose the date, and, in fact, did choose the date on which this stock option was granted.  Nakasone and Trust approved this grant on a date after the reported grant date and knowingly used hindsight to pick the date when Staples' stock was at a monthly low.  Nakasone and Trust knew that the Plans required them to use the fair market value on the actual date of grant and knew that backdating to a date with a lower price violated the Plans.

---

[4] Where the total number of options is unknown, *i.e.*, where the phrase "at least" is utilized, the stock option grant was not reported in any of the Company's proxy statements filed with the SEC, but were first disclosed in Form 4 filings, which only included the number of stock options pursuant to the grant that were exercised and left unexercised on the transaction date.

27

### March 1996



### 1996 Fiscal Year



90.     On November 1, 1996, the Compensation Committee, of which Defendants Trust and Nakasone were members, purportedly granted at least 20,250 stock options to Defendant

Demos Parneros, the Company's Vice President of Operations at an exercise price of $5.30 - the *lowest closing stock price of the month*.

91.     The Compensation Committee, of which Defendants Nakasone and Trust were members, had the sole authority to choose the date, and, in fact, did choose the date on which this stock option was granted.   Nakasone and Trust approved this grant on a date after the reported grant date and knowingly used hindsight to pick the date when Staples' stock was at a monthly low.  Nakasone and Trust knew that the Plans required them to use the fair market value on the actual date of grant and knew that backdating to a date with a lower price violated the Plans.

### November 1996



**1996 Fiscal Year**



**Fiscal Year 1997 Option Grants (Fiscal Year ended January 31, 1998)**

92.     On August 28, 1997, the Compensation Committee, of which Nakasone and Trust were members, purportedly granted stock options to Defendants Stemberg, Vassalluzzo, Mahoney, Sargent, Hoyt, Levitan, Gentry, Lewis, Hickey and Harsantat an exercise price of $6.85 - the *lowest closing stock price of the third quarter of the fiscal year ended January 30, 1998*.

93.     The Compensation Committee, of which Defendants Nakasone and Trust were members, had the sole authority to choose the date, and, in fact, did choose the date on which this stock option was granted.  Nakasone and Trust approved this grant on a date after the reported grant date and knowingly used hindsight to pick the date when Staples' stock was at a monthly low.  Nakasone and Trust knew that the Plans required them to use the fair market value on the actual date of grant and knew that backdating to a date with a lower price violated the Plans.

## Third Quarter of Fiscal Year 1997



## 1997 Fiscal Year



| Purported Date of Grant | Name | Number of Options[5] | Exercise Price | Adjusted Number of Options | Adjusted Exercise Price |
|---|---|---|---|---|---|
| 08/28/97 | Stemberg | 240,000 | $15.42 | 540,263 | $6.85 |
| | Vassalluzzo | 52,500 | $15.42 | 118,182 | $6.85 |
| | Mahoney | 82,500 | $15.42 | 185,715 | $6.85 |
| | Sargent | 82,500 | $15.42 | 185,715 | $6.85 |
| | Hoyt | at least 35,000 | $23.13 | at least 118,182 | $6.85 |
| | Levitan | at least 24,000 | $23.13 | at least 81,039 | $6.85 |
| | Gentry | at least 35,000 | $23.13 | at least 118,182 | $6.85 |
| | Lewis | at least 83,250 | $10.28 | at least 124,936 | $6.85 |
| | Hickey | at least 22,500 | $10.28 | at least 33,766 | $6.85 |
| | Harsant | at least 67,500 | $10.28 | at least 101,299 | $6.85 |

**Fiscal Year 1998 Option Grants (Fiscal Year ended January 30, 1999)**

94.     On July 1, 1998, the Compensation Committee, of which Nakasone and Trust were members, purportedly granted stock options to Defendants Stemberg, Vassalluzzo, Mahoney, Sargent, Bingleman, Mayerson, Levitan, Harsant, Gentry, Lewis, Hoyt, Bingleman, Crosier, Peters and Light at an exercise price of $13.39 - the *lowest closing stock price of the month*.

95.     The Compensation Committee, of which Defendants Nakasone and Trust were members, had the sole authority to choose the date, and, in fact, did choose the date on which this stock option was granted.  Nakasone and Trust approved this grant on a date after the reported grant date and knowingly used hindsight to pick the date when Staples' stock was at a monthly low.  Nakasone and Trust knew that the 1992 Plan required them to use the fair market

---

[5] Where the total number of options is unknown, *i.e.*, where the phrase "at least" is utilized, the stock option grant was not reported in any of the Company's proxy statements filed with the SEC, but were first disclosed in Form 4 filings, which only included the number of stock options pursuant to the grant that were exercised and left unexercised on the transaction date.

value on the actual date of grant and knew that backdating to a date with a lower price violated the 1992 Plan.

### July 1998



### 1998 Fiscal Year



| Purported Date of Grant | Name | Number of Options[6] | Exercise Price | Adjusted Number of Options | Adjusted Exercise Price |
|---|---|---|---|---|---|
| 07/01/98 | Stemberg | 2.4 million | $20.08 | 3,599,104 | $13.39 |
| | Vassalluzzo | 585,000 | $20.08 | 877,282 | $13.39 |
| | Mahoney | 585,000 | $20.08 | 877,282 | $13.39 |
| | Sargent | 585,000 | $20.08 | 877,282 | $13.39 |
| | Bingleman | 450,000 | $20.08 | 674,832 | $13.39 |
| | Mayerson | at least 45,000 | $30.13 | at least 101,258 | $13.39 |
| | Levitan | at least 42,000 | $30.13 | at least 94,508 | $13.39 |
| | Harsant | at least 200,000 | $30.13 | at least 450,037 | $13.39 |
| | Gentry | at least 200,000 | $30.13 | at least 450,037 | $13.39 |
| | Lewis | at least 42,000 | $30.13 | at least 94,508 | $13.39 |
| | Hoyt | at least 200,000 | $30.13 | at least 450,037 | $13.39 |
| | Bingleman | at least 300,000 | $30.13 | at least 675,056 | $13.39 |
| | Crosier | at least 80,000 | $30.13 | at least 180,015 | $13.39 |
| | Peters | at least 200,000 | $30.13 | at least 450,037 | $13.39 |
| | Light | at least 55,000 | $30.13 | at least 123,760 | $13.39 |

96.    Interestingly, on consecutive dates in 1998, specifically November 30, 1998 and December 1, 1998, the Compensation Committee, of which Defendants Nakasone and Trust were members, purportedly granted over 200,000 stock options to Joseph G. Doody, the Company's President - Staples Contract & Commercial, at $15.53 and $15.67, respectively.  The options granted on November 30, 1998 preceded a substantial rise in the price of the Company's stock, while the options granted on December 1, 1998 were granted at one of the *lowest closing prices of the month*.

---

[6] Where the total number of options is unknown, *i.e.*, where the phrase "at least" is utilized, the stock option grant was not reported in any of the Company's proxy statements filed with the SEC, but were first disclosed in Form 4 filings, which only included the number of stock options pursuant to the grant that were exercised and left unexercised on the transaction date.

97.     The Compensation Committee, of which Defendants Nakasone and Trust were members, had the sole authority to choose the date, and, in fact, did choose the date on which this stock option was granted.   Nakasone and Trust approved this grant on a date after the reported grant date and knowingly used hindsight to pick the date when Staples' stock was at a monthly low.   Nakasone and Trust knew that the 1992 Plan required them to use the fair market value on the actual date of grant and knew that backdating to a date with a lower price violated the 1992 Plan.

### Fourth Quarter of Fiscal Year 1998



## 1998 Fiscal Year



## December 1998



**1998 Fiscal Year**



**Fiscal Year 2000 Option Grants (Fiscal Year ended February 3, 2001)**

98.     On June 6, 2000, the Compensation Committee, of which Defendants Nakasone and Trust were members, purportedly granted stock options to Defendants Stemberg, Vassalluzzo, Hoyt, Mahoney, Sargent, Gentry, Levy, Levitan, Hickey, Harsant, Hoyt, VanWoerkom, Lewis, Doody, Light, Crosier, Peters, Moore and Ellinger at an exercise price of $9.38 - the ***lowest closing stock price of the second quarter of the fiscal year ended February 3, 2001***.

99.     The Compensation Committee, of which Defendants Nakasone and Trust were members, had the sole authority to choose the date, and, in fact, did choose the date on which this stock option was granted.  Nakasone and Trust approved this grant on a date after the reported grant date and knowingly used hindsight to pick the date when Staples' stock was at a monthly low.  Nakasone and Trust knew that the 1992 Plan required them to use the fair market value on the actual date of grant and knew that backdating to a date with a lower price violated

the 1992 Plan.

### Second Quarter of Fiscal Year 2000



### 2000 Fiscal Year



| Purported Date of Grant | Name | Number of Options[7] | Exercise Price | Adjusted Number of Options | Adjusted Exercise Price |
|---|---|---|---|---|---|
| 06/06/00 | Stemberg | 150,000 | $14.06 | 224,840 | $9.38 |
| | Vassalluzzo | 155,000 | $14.06 | 232,335 | $9.38 |
| | Hoyt | 37,500 | $14.06 | 56,210 | $9.38 |
| | Mahoney | 105,000 | $14.06 | 157,388 | $9.38 |
| | Sargent | 187,500 | $14.06 | 281,050 | $9.38 |
| | Gentry | at least 50,000 | $14.06 | at least 74,947 | $9.38 |
| | Levy | at least 50,000 | $14.06 | at least 74,947 | $9.38 |
| | Levitan | at least 6,375 | $14.06 | at least 9,556 | $9.38 |
| | Hickey | at least 13,000 | $14.06 | at least 19,486 | $9.38 |
| | Harsant | at least 15,000 | $14.06 | at least 22,484 | $9.38 |
| | Hoyt | at least 37,500 | $14.06 | at least 56,210 | $9.38 |
| | VanWoerkom | at least 15,000 | $14.06 | at least 22,484 | $9.38 |
| | Lewis | at least 12,750 | $14.06 | at least 19,111 | $9.38 |
| | Doody | at least 25,000 | $14.06 | at least 37,473 | $9.38 |
| | Light | at least 20,000 | $14.06 | at least 29,979 | $9.38 |
| | Crosier | at least 20,000 | $14.06 | at least 29,979 | $9.38 |
| | Peters | at least 50,000 | $14.06 | at least 74,947 | $9.38 |
| | Moore | at least 20,000 | $14.06 | at least 29,979 | $9.38 |
| | Ellinger | at least 7,500 | $14.06 | at least 11,242 | $9.38 |

100.    On August 1, 2000, the Compensation Committee, of which Defendants Nakasone and Trust were members, purportedly granted at least 157,083 stock options to Edward C. Harsant, the Company's President - North American Stores, at an exercise price of $8.88 - the *lowest closing stock price of the month*.

---

[7] Where the total number of options is unknown, *i.e.*, where the phrase "at least" is utilized, the stock option grant was not reported in any of the Company's proxy statements filed with the SEC, but were first disclosed in Form 4 filings, which only included the number of stock options pursuant to the grant that were exercised and left unexercised on the transaction date.

101.   The Compensation Committee, of which Defendants Nakasone and Trust were members, had the sole authority to choose the date, and, in fact, did choose the date on which this stock option was granted.   Nakasone and Trust approved this grant on a date after the reported grant date and knowingly used hindsight to pick the date when Staples' stock was at a monthly low.   Nakasone and Trust knew that the 1992 Plan required them to use the fair market value on the actual date of grant and knew that backdating to a date with a lower price violated the 1992 Plan.

### August 2000



**2000 Fiscal Year**



**Fiscal Year 2001 Option Grants (Fiscal Year ended February 2, 2002)**

102.     During the following year, on December 4, 2001, the Compensation Committee, of which Defendants Blank, Nakasone and Trust were members, purportedly granted 750,000 stock options to Ronald L. Sargent, the Company's President and COO, at an exercise price of $11.60 - one of the lowest closing stock prices of the month.

103.     The Compensation Committee, of which Defendants Blank, Nakasone and Trust were members, had the sole authority to choose the date, and, in fact, did choose the date on which this stock option was granted.  Blank, Nakasone and Trust approved this grant on a date after the reported grant date and knowingly used hindsight to pick the date when Staples' stock was at a monthly low.  Blank, Nakasone and Trust knew that the 1992 Plan required them to use the fair market value on the actual date of grant and knew that backdating to a date with a lower price violated the 1992 Plan.

## December 2001



## 2001 Fiscal Year



## Post-SOX Backdating at Staples

104.    Prior to the enactment of the Sarbanes-Oxley Act of 2002 ("SOX"), the Individual

Defendants were able to engage in the backdating of stock option grants with relative ease, because under federal law they were only required to report stock option grants to the SEC once a year.

105.    Pursuant to SOX, beginning on August 29, 2002, executives and directors were required to report stock option grants to the SEC within two days of the grant.  With this new reporting requirement in place, the stock option backdating practices seen previously from 1994 to 2003 for the most part came to an end.

106.    In a report released on October 20, 2006, the research firm of Glass, Lewis & Co. conducted an extensive study surrounding the belief that late Form 4 filings can be one of the signs of post-SOX stock option backdating (the "Glass Lewis Report").  Specifically, according to the Glass Lewis Report, the research firm noted that "when we find late Form 4 filings where the price of the underlying stock increased materially between the purported grant date and the day the Form 4 was filed, we believe this raises legitimate questions about whether the grant was backdated."

**Fiscal Year 2003 Option Grant (Fiscal Year ended January 31, 2004)**

107.    On July 1, 2003, the Compensation Committee, of which Defendants Barnes, Blank and Trust were members, granted Defendants Sargent, Stemberg, Mahoney, Vassalluzzo, Anderson, Parneros, Nachbor, Doody and VanWoerkom stock options at an exercise price of $12.23 – the *lowest closing stock price of the month*.

108.    The Compensation Committee, of which Defendants Barnes, Blank and Trust were members, had the sole authority to choose the date, and, in fact, did choose the date on which this stock option was granted.  Barnes, Blank and Trust approved this grant on a date after the reported grant date and knowingly used hindsight to pick the date when Staples' stock was at

a monthly low.  Barnes, Blank and Trust knew that the 1992 Plan required them to use the fair market value on the actual date of grant and knew that backdating to a date with a lower price violated the 1992 Plan.

### July 2003



### 2003 Fiscal Year



| Purported Date of Grant | Name | Number of Options | Exercise Price | Adjusted Number of Options | Adjusted Exercise Price |
|---|---|---|---|---|---|
| 07/01/03 | Sargent | 350,000 | $18.35 | 525,143 | $12.23 |
| | Stemberg | 350,000 | $18.35 | 525,143 | $12.23 |
| | Mahoney | 100,000 | $18.35 | 150,041 | $12.23 |
| | Vassalluzzo | 100,000 | $18.35 | 150,041 | $12.23 |
| | Anderson | 120,000 | $18.35 | 180,049 | $12.23 |
| | Parneros | at least 50,000 | $18.00 | at least 73,590 | $12.23 |
| | Nachbor | at least 12,000 | $18.00 | at least 17,661 | $12.23 |
| | Doody | at least 50,000 | $18.00 | at least 73,590 | $12.23 |
| | VanWoerkom | at least 20,000 | $18.00 | at least 29,436 | $12.23 |

109.     Each and every one of the aforementioned Staples stock option grants was dated just before a significant increase in Staples stock price and/or at or near Staples's lowest closing stock price of the pertinent fiscal quarter and/or month.  The reason for the unique pattern set forth in the preceding paragraphs is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made.  Rather, the Compensation Committee members, with the knowledge and approval of the other members of the Board, knowingly and deliberately backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Staples stock was lower than the market price on the actual grant dates, thereby unduly benefiting the Individual Defendants who received the backdated stock options.  This improper backdating, which violated the terms of the Plans, resulted in stock option grants with lower exercise prices, which improperly increased the value of the stock options and improperly reduced the amounts the Individual Defendants had to pay to the Company upon the exercise of the stock options.

**Staples' Backdating Comes to Light**

110.    The Individual Defendants' backdating at Staples first came to light on November 14, 2006, when Staples revealed that the Company conducted a review of its historical stock option granting practices during the period of 1997 to the present and **admitted** that previous stock options were backdated.  Specifically, Staples stated:

> Q3 Stock Based Compensation Correction
>
> During the third quarter of 2006, the company and its Audit Committee, assisted by outside counsel, conducted a review of the company's historical stock option granting practices during the period from 1997 to the present. Based on the results of the review, *the company has recorded a $10.8 million expense ($8.6 million net of taxes) in the third quarter to reflect the cumulative impact of accounting errors due to the use of incorrect measurement dates*, without restating any historical financial statements. The Company has concluded that the use of incorrect measurement dates was not the result of intentional wrongdoing and has taken steps to improve the controls over its option granting processes. (Emphasis added.).

111.    Additionally, on December 22, 2006, Staples filed a Form 8-K with the SEC in which the Company admitted further modifications were needed to correct past stock option grants, specifically the July 1, 2003 grant.  The Company stated:

> On December 20, 2006, Staples, Inc. (the "Company") amended certain outstanding and unexercised non-qualified stock options granted under the Company's Amended and Restated 1992 Equity Incentive Plan to the executive officers listed below.  These amendments increased the per share exercise prices of the options listed below from $12.2333 to $12.88 (adjusted to reflect stock splits) and were made to avoid potential adverse tax consequences.

| Option Recipient | Date of Grant | Number of Shares (Split Adjusted) | Original Exercise Price (Split Adjusted) | Amended Exercise Price (Split Adjusted) |
|---|---|---|---|---|
| Ronald L. Sargent, Chairman and Chief Executive Officer | July 1, 2003 | 525,000 | $ 12.2333 | $ 12.88 |
| John J. Mahoney, Vice Chairman and Chief Financial Officer | July 1, 2003 | 150,000 | $ 12.2333 | $ 12.88 |
| Joseph G. Doody, President, North American Delivery | July 1, 2003 | 75,000 | $ 12.2333 | $ 12.88 |

46

112.   Also on December 22, 2006, Defendants Sargent, Mahoney and Doody filed Form 4s with the SEC that reflected the exercise price change and indicated that the change was a "Correction of Exercise Price."  Defendants Parneros and VanWoerkom filed similar Form 4s reflecting the corrected exercise price of their options previously represented as having been granted on July 1, 2003.  The only date during fiscal year 2003 on which the Company's stock closed at the 'corrected' exercise price of $12.88 was July 10, 2003.

### False Financial Statements and Concealment of Misconduct

113.   As a result of the Individual Defendants' approval and receipt of backdated stock options, the Individual Defendants caused Staples to issue materially false and misleading financial statements and reports, including but not limited to annual reports, filed with the SEC and disseminated to shareholders and the public as Forms 10-K, proxy statements, filed with the SEC and disseminated to shareholders and the public as Forms DEF-14A, and other quarterly and interim reports.

114.   At the Senate Finance Committee Hearing, SEC Chairman Christopher Cox, stated, "Rather obviously, this fact pattern [of backdating options] results in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a violation of the tax laws."  The Commissioner of the IRS Mark Everson agreed and further stated, "Picking a date on which the stock price was low in comparison with the current price gives the employee the largest potential for gain on the option and makes it possible for the employee to benefit from corporate performance that occurred before the option was granted."

115.   In his statement before the Senate Finance Committee, Deputy Attorney General Paul J. McNulty, described the practice of stock option backdating "as a brazen abuse of

corporate power to artificially inflate the salaries of corporate wrongdoers at the expense of shareholders," and said "For some of those companies that have now disclosed backdated grants, corporate reputations have been tarnished and shareholder value has diminished substantially. . . ."

116.    On September 6, 2006, *MarketWatch*, in an article titled "SEC Probing more than 100 firms on options: Cox," quoted the Senate Banking Committee Chairman, Senator Richard Shelby, saying that manipulation of options grant dates "appears to be a black-and-white example of securities fraud," and "Corporate officers and directors engaging in this practice are cheating the owners of the company and should be held accountable to the fullest extent possible."

117.    On July 20, 2006, in a press conference announcing the SEC's decision to file civil and criminal charges for stock option backdating against Brocade Communications Systems, SEC Chairman Christopher Cox described the importance of "stamp[ing] out fraudulent stock option backdating."  Chairman Cox emphasized that "[T]his issue is important because it goes to the heart of the relationship between a corporation and its shareholders.  In order for our system of public ownership to work, the interests of shareholders, and not the personal interests of the company's management or its directors, must be paramount.  The proper use of options for compensation can be an important tool for companies that produces tangible benefits for shareholders.  But options backdating strikes at the heart of investor confidence in our capital markets.  It deceives investors and the market as a whole about the financial health of companies that cheat in this way.  It understates a company's compensation expenses and overstates the company's income."

118.     Chairman Cox continued at that press conference by stating that, "[backdating in many cases] makes a hash of (companies') financial statements . . . [and is] poisonous [to efficient markets]. . . .  It is securities fraud if you falsify books and records.  It is securities fraud if you present financial statements to the SEC that do not comply with generally accepted accounting principles.  There is no requirement that (the defendant) personally profit [to prove that a crime occurred.]"

119.     On June 18, 2006, in an article titled, "Options Scandal Brewing in Corporate World," SEC Chairman Christopher Cox was quoted, saying "[Backdating options] isn't a question about 'Whoops, I may have (accidentally) crossed a line here . . . .  It's a question of knowingly betting on a race that's already been run."

120.     On May 26, 2006, *Forbes*, in an article titled, "The Next Big Scandal," quoted Former Securities and Exchange Commission ("SEC") Chairman Harvey L. Pitt, saying "What's so terrible about backdating options grants?  For one thing, it likely renders a company's proxy materials false and misleading.  Proxies typically indicate that options are granted at fair market value.  But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders."

121.     The Individual Defendants' secret stock option backdating scheme caused each of Staples's Forms 10-K405, Forms 10-K and Forms 10-Q for the relevant period to materially understate Staples's compensation expense and materially overstate the Company's net income or materially understate its net loss, because the Individual Defendants failed to expense the "in the money" portion of Staples's stock option grants during the period as required by APB 25.

122.     As a result of the improper backdating of stock options, the Company, with the knowledge, approval and participation of each of the Individual Defendants,

a. violated the terms of the Company's shareholder-approved stock option plans by granting stock options with exercise prices less than the fair market value of the stock on the actual date of grant;

b. violated APB 25 by failing to recognize compensation expenses incurred when the improperly backdated stock options were granted;

c. violated Section 162(m) by taking tax deductions based on stock option grants that were not payable solely on account of the attainment of one or more performance goals and violated the terms of the Company's shareholder-approved stock option plans; and

d. produced and disseminated to Staples shareholders and the market false financial statements that improperly recorded and accounted for the backdated stock option grants, and thereby understated compensation expenses and overstated net income.

123. Staples's financial results for the fiscal years ended in 1995 through 2006 were reported in Annual Reports on Form 10-K and/or Form 10-K405 filed with the SEC. Each Form 10-K and/or 10-K405 was simultaneously distributed to Staples shareholders and the investing public. Defendants Stemberg, Hanaka, Wilson, Sargent, Hickey, Mahoney, Mayerson, Nachbor, Anderson, Barnes, Blank, Burton, Moriarty, Nakasone, Trust and Walsh, with the knowledge that the financial statements contained therein were false and misleading because they backdated stock option grants and knew that they were violating APB 25 and Section 162(m), each signed at least one Form 10-K and/or Form 10-K405 filed with the SEC between 1995 and 2006:

| Defendant Signatory | Form 10-K or Form 10-K405 for the Fiscal Years Ended In |
|---|---|
| Stemberg | 1995-2005 |
| Hanaka | 1997 |
| Wilson | 1995-1996 |
| Sargent | 2000-2006 |
| Hickey | 2000-2002 |

| | |
|---|---|
| Mahoney | 1997-2006 |
| Mayerson | 1998-1999 |
| Nachbor | 2004 |
| Anderson | 1998-2006 |
| Barnes | 2003-2005 |
| Blank | 2002-2006 |
| Burton | 1996-2006 |
| Moriarty | 1995-2006 |
| Nakasone | 1995, 1997-2006 |
| Trust | 1997-2006 |
| Walsh | 1995, 1997-2006 |

124.   Specifically, the Company, with the knowledge, approval, and participation of each of the Individual Defendants listed below, disseminated its false financial statements in, *inter alia*, the following Form 10-K and Form 10-K405 filings:

a.   Defendants Stemberg, Moriarty, Nakasone, Wilson and Walsh who signed the Form 10-K for the fiscal year ended January 28, 1995, filed with the SEC on May 22, 1995, knowingly approved the false statements in the 10-K and knew that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m);

b.   Defendants Stemberg, Wilson, Burton and Moriarty who signed the Form 10-K405 for the fiscal year ended February 3, 1996, filed with the SEC on April 11, 1996, knowingly approved the false statements in the 10-K405 and knew that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m);

c.   Defendants Stemberg, Hanaka, Mahoney, Burton, Moriarty, Nakasone,

Trust and Walsh who signed the Form 10-K for the fiscal year ended February 1, 1997, filed with the SEC on April 30, 1997, knowingly approved the false statements in the 10-K and knew that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m);

d.      Defendants Stemberg, Mahoney, Mayerson, Anderson, Burton, Moriarty, Nakasone, Trust and Walsh who signed the Form 10-K for the fiscal year ended January 31, 1998, filed with the SEC on April 17, 1998, knowingly approved the false statements in the 10-K and knew that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m);

e.      Defendants Stemberg, Anderson, Burton, Mahoney, Mayerson, Moriarty, Nakasone, Trust and Walsh who signed the Form 10-K for the fiscal year ended January 30, 1999, filed with the SEC on April 5, 1999, knowingly approved the false statements in the 10-K and knew that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m);

f.      Defendants Stemberg, Sargent, Hickey, Anderson, Mahoney, Burton, Moriarty, Nakasone, Trust and Walsh who signed the Form 10-K for the fiscal year ended January 29, 2000, filed with the SEC on March 10, 2000, knowingly approved the false statements in the 10-K and knew that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m);

g.      Defendants Stemberg, Sargent, Hickey, Anderson, Mahoney, Burton, Moriarty, Nakasone, Trust and Walsh who signed the Form 10-K for the fiscal year ended February 3, 2001, filed with the SEC on March 20, 2001 knowingly approved the false statements in the 10-K and knew that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m);

h.      Defendants Stemberg, Sargent, Hickey, Anderson, Mahoney, Blank, Burton, Moriarty, Nakasone, Trust and Walsh who signed the Form 10-K for the fiscal year ended February 2, 2002, filed with the SEC on April 4, 2002, knowingly approved the false statements in the 10-K and knew that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m);

i.      Defendants Stemberg, Sargent, Anderson, Mahoney, Barnes, Blank, Burton, Moriarty, Nakasone, Trust and Walsh who signed the Form 10-K for the fiscal year ended February 1, 2003, filed with the SEC on March 5, 2003, knowingly approved the false statements in the 10-K and knew that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m);

j.      Defendants Stemberg, Sargent, Anderson, Mahoney, Nachbor, Barnes, Blank, Burton, Moriarty, Nakasone, Trust and Walsh who signed the Form 10-K for the fiscal year ended January 31, 2004, filed with the SEC on

March 4, 2004, knowingly approved the false statements in the 10-K and knew that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m);

k.    Defendants Stemberg, Sargent, Anderson, Mahoney, Barnes, Blank, Burton, Moriarty, Nakasone, Trust and Walsh who signed the Form 10-K for the fiscal year ended January 29, 2005, filed with the SEC on February 24, 2005, knowingly approved the false statements in the 10-K and knew that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m); and

l.    Defendants Sargent, Anderson, Mahoney, Blank, Burton, Moriarty, Nakasone, Trust and Walsh who signed the Form 10-K for the fiscal year ended February 1, 2003, filed with the SEC on March 5, 2003, knowingly approved the false statements in the 10-K and knew that the statements contained therein were false because they backdated the option grants and knew that they were violating APB 25 and Section 162(m).

125.   Additionally, in each of its Form 10-K405 and Form 10-K Annual Reports filed with the SEC from 1995 to 2004, the Individual Defendants that signed the financial statements, specifically Defendants Stemberg, Hanaka, Wilson, Sargent, Hickey, Mahoney, Mayerson, Nachbor, Anderson, Barnes, Blank, Burton, Moriarty, Nakason, Trust and Walsh, as detailed above, caused Staples to falsely represent that it followed APB 25 to account for stock-based compensation. For example, in the Company's Form 10-K filed with the SEC on March 20,

2001, Staples stated:

> ***Staples elected to follow Accounting Principles Board Opinion
> No. 25***, "Accounting for Stock Issued to Employees" ("APB 25")
> and related interpretations in accounting for its employee stock
> options because, as discussed below, the alternative fair value
> accounting provided for under FASB Statement No. 123,
> "Accounting for Stock-Based Compensation" ("FAS 123") requires
> use of option valuation models that were not developed for use in
> valuing employee stock options. ***Under APB 25, since the exercise
> price of Staples' employee stock options equals the market price
> of the underlying stock on the date of grant, no compensation
> expense is recognized.***   (Emphasis added).

Such statements were materially false and misleading because Staples had granted stock options

at prices that were below fair market value on the date of the grant and failed to account for the

"in-the-money" options as required by APB 25.

126.   As alleged previously, APB 25 required the Individual Defendants to record

compensation expense for options that were "in-the-money" on the date of grant.  However, they

did not do so, thereby materially understating Staples' compensation expense and materially

overstating Staples' net income or materially understating its net loss.  These statements were

designed to conceal, and did in fact conceal, the fact that the Individual Defendants were

engaged in the continuous and systematic backdating of stock option grants to Staples insiders in

violation of state and federal laws.

127.   Additionally, Staples' materially false and misleading financial statements for

fiscal years 1994 to 2003 were included in its Forms 10-K filed for subsequent fiscal years.  For

this reason, and to the extent they included financials from earlier periods, Staples' annual

reports on Form 10-K for fiscal years 2004 through 2006 were also materially false and

misleading.  By participating in the secret backdating of stock options, and by reviewing and/or

signing these subsequent annual reports, the Individual Defendants knew, or were reckless in not

knowing, that the financial statements in these later filings were materially false and misleading.

128.    The Individual Defendants' stock option backdating caused each of Staples' Forms 10-K for the relevant period to materially understate Staples' compensation expense and materially overstate the Company's net income or materially understate its net loss, because the Individual Defendants failed to expense the "in-the-money" portion of Staples' stock option grants during the period as required by APB 25.

### False CEO and CFO Certifications

129.    Furthermore, in connection with the filing of certain Annual Reports on Form 10-K during the relevant period, Defendants Sargent and Mahoney filed false Certifications of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (the "Certification"), certifying that each Annual Report on Form 10-K "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."  Defendants Sargent and Mahoney signed the following Certifications:

    a.    for the Form 10-K for the fiscal year ended February 1, 2003, filed with the SEC on March 5, 2003;

    b.    for the Form 10-K for the fiscal year ended January 31, 2004, filed with the SEC on March 4, 2004;

    c.    for the Form 10-K for the fiscal year ended January 29, 2005, filed with the SEC on February 24, 2005; and

    d.    for the Form 10-K for the fiscal year ended January 28, 2006, filed with the SEC on February 28, 2006.

### The Individual Defendants' Concealment of Their Misconduct

130.    From 1995 to 2004, the Individual Defendants, for the purpose and with the effect

of concealing the improper stock option backdating, caused Staples to disseminate to shareholders and file with the SEC annual proxy statements that falsely reported the dates of stock option grants to the Individual Defendants and falsely stated that options were granted to the Individual Defendants at the "fair market value of Staples common stock on the date of grant."

131.   On May 26, 1995, Staples, with the effect of concealing the improper option backdating, filed with the SEC and disseminated to Staples' shareholders the 1994 Proxy Statement, which provided, among other things, notice of and information for Staples' annual shareholder's meeting to be held June 29, 1995.  The 1994 Proxy Statement falsely reported reported September 23, 1994 as the date of stock option grants to Defendants Stemberg, Hanaka, Wilson, Pepi and Vassalluzzo and stated that the exercise price of these stock options was equal to "the fair market value per share of Common Stock on the date of grant."  These statements were materially false and misleading in light of the backdating alleged herein.

132.   The 1994 Proxy Statement failed to report the true value of the compensation paid to Defendants Stemberg, Hanaka, Wilson, Pepi and Vassalluzzo or that the options were backdated as alleged herein, rather than issued on the date at which the stock traded at the market value identified in the proxy statement.  Thus, the backdated stock options provided undisclosed compensation to Defendants Stemberg, Hanaka, Wilson, Pepi and Vassalluzzo.

133.   Defendants Nakasone, Trust, Burton, Moriarty and Walsh knowingly approved the false statements in the 1994 Proxy Statement and knew that the 1994 Proxy Statement was false and misleading because the option grants were backdated.

134.   On April 20, 1998, Staples, with the effect of concealing the improper option backdating, filed with the SEC and disseminated to Staples' shareholders the 1997 Proxy

Statement, which provided, among other things, notice of and information for Staples' annual shareholder's meeting to be held June 4, 1998.  The 1997 Proxy Statement falsely reported August 28, 1997 as the date of stock option grants to Defendants Stemberg, Mahoney, Sargent and Vassalluzzo and stated that the exercise price of these stock options was equal to "the fair market value per share of Common Stock on the date of grant."  These statements were materially false and misleading in light of the backdating alleged herein.

135.    The 1997 Proxy Statement failed to report the true value of the compensation paid to Defendants Stemberg, Mahoney, Sargent and Vassalluzzo or that the options were backdated as alleged herein, rather than issued on the date at which the stock traded at the market value identified in the proxy statement.  Thus, the backdated stock options provided undisclosed compensation to Defendants Stemberg, Mahoney, Sargent and Vassalluzzo.

136.    Defendants Anderson, Burton, Nakasone, Trust, Moriarty and Walsh knowingly approved the false statements in the 1997 Proxy Statement and knew that the 1997 Proxy Statement was false and misleading because the option grants were backdated.

137.    On April 19, 1999, Staples, with the effect of concealing the improper option backdating, filed with the SEC and disseminated to Staples' shareholders the 1998 Proxy Statement, which provided, among other things, notice of and information for Staples' annual shareholder's meeting to be held June 2, 1999.  The 1998 Proxy Statement falsely reported July 1, 1998 as the date of stock option grants to Defendants Stemberg, Mahoney, Sargent, Vassalluzzo and Bingleman and stated that the exercise price of these stock options was equal to "the fair market value per share of Common Stock on the date of grant."  These statements were materially false and misleading in light of the backdating alleged herein.

138.    The 1998 Proxy Statement failed to report the true value of the compensation paid

to Defendants Stemberg, Mahoney, Sargent, Vassalluzzo and Bingleman or that the options were backdated as alleged herein, rather than issued on the date at which the stock traded at the market value identified in the proxy statement.  Thus, the backdated stock options provided undisclosed compensation to Defendants Stemberg, Mahoney, Sargent, Vassalluzzo and Bingleman.

139.    Defendants Anderson, Burton, Nakasone, Trust, Moriarty and Walsh knowingly approved the false statements in the 1998 Proxy Statement and knew that the 1998 Proxy Statement was false and misleading because the option grants were backdated.

140.    On May 9, 2001, Staples, with the effect of concealing the improper option backdating, filed with the SEC and disseminated to Staples' shareholders the 2000 Proxy Statement, which provided, among other things, notice of and information for Staples' annual shareholder's meeting to be held June 11, 2001.  The 2000 Proxy Statement falsely reported June 6, 2000 as the date of stock option grants to Defendants Stemberg, Mahoney, Sargent, Vassalluzzo and Hoyt and stated that the exercise price of these stock options was equal to "the fair market value per share of Staples RD stock on the date of grant, based on the last reported sales price on NASDAQ."  These statements were materially false and misleading in light of the backdating alleged herein.

141.    The 2000 Proxy Statement failed to report the true value of the compensation paid to Defendants Stemberg, Mahoney, Sargent, Vassalluzzo and Hoyt or that the options were backdated as alleged herein, rather than issued on the date at which the stock traded at the market value identified in the proxy statement.  Thus, the backdated stock options provided undisclosed compensation to Defendants Stemberg, Mahoney, Sargent, Vassalluzzo and Hoyt.

142.    Defendants Anderson, Burton, Nakasone, Trust, Sargent, Moriarty and Walsh knowingly approved the false statements in the 2000 Proxy Statement and knew that the 2000

Proxy Statement was false and misleading because the option grants were backdated.

143.    On May 3, 2002, Staples, with the effect of concealing the improper option backdating, filed with the SEC and disseminated to Staples' shareholders the 1997 Proxy Statement, which provided, among other things, notice of and information for Staples' annual shareholder's meeting to be held June 11, 2002.  The 2001 Proxy Statement falsely reported December 4, 2001 as the date of stock option grants to defendant Sargent and stated that the exercise price of these stock options was equal to "the fair market value per share of Staples common stock on the date of grant."  These statements were materially false and misleading in light of the backdating alleged herein.

144.    The 2001 Proxy Statement failed to report the true value of the compensation paid to defendant Sargent or that the options were backdated as alleged herein, rather than issued on the date at which the stock traded at the market value identified in the proxy statement.  Thus, the backdated stock options provided undisclosed compensation to defendant Sargent

145.    Defendants Anderson, Burton, Blank, Nakasone, Trust, Sargent, Moriarty and Walsh knowingly approved the false statements in the 2001 Proxy Statement and knew that the 2001 Proxy Statement was false and misleading because the option grants were backdated.

146.    On May 5, 2004, Staples, with the effect of concealing the improper option backdating, filed with the SEC and disseminated to Staples' shareholders the 2003 Proxy Statement, which provided, among other things, notice of and information for Staples' annual shareholder's meeting to be held June 17, 2004.  The 2003 Proxy Statement falsely reported July 1, 2003 as the date of stock option grants to Defendants Stemberg, Mahoney, Sargent, Vassalluzzo and Anderson and stated that the exercise price of these stock options was equal to "the fair market value per share of Staples common stock on the date of grant."   These

statements were materially false and misleading in light of the backdating alleged herein.

147.   The 2003 Proxy Statement failed to report the true value of the compensation paid to Defendants Stemberg, Mahoney, Sargent, Vassalluzzo and Anderson or that the options were backdated as alleged herein, rather than issued on the date at which the stock traded at the market value identified in the proxy statement.  Thus, the backdated stock options provided undisclosed compensation to Defendants Stemberg, Mahoney, Sargent, Vassalluzzo and Anderson.

148.   Defendants Anderson, Barnes, Burton, Blank, Nakasone, Trust, Sargent, Moriarty and Walsh knowingly approved the false statements in the 2003 Proxy Statement and knew that the 2003 Proxy Statement was false and misleading because the option grants were backdated.

149.   The Individual Defendants caused Staples to disseminate to shareholders proxy statements in connection with the Company's annual shareholder meetings and periodically for special shareholder meetings during the relevant period.  The Individual Defendants prepared and/or reviewed each proxy statement between 1995 and 2004.  Moreover, they knew, or were deliberately reckless in not knowing, that the proxies were materially false and misleading.

150.   The Staples proxy statements that were disseminated to shareholders by the Individual Defendants annually in connection with annual shareholders' meeting typically concerned the election of directors, the approval and adoption of Staples' stock option plan and authorization to reserve shares for future issuance under the stock option plans, and ratification of the selection of Staples' auditor.  Each proxy statement disseminated to shareholders during this period contained materially false and misleading disclosures or omitted information about Staples' stock option practices, as detailed above.

151.   Moreover, in the Compensation Committee Reports on Executive Compensation in the Company's proxy statements filed between 1995 and 2004, Staples falsely stated that its

executive compensation program was designed to "retain and reward executives who are responsible for leading Staples in achieving its business objectives," when, in fact, the executives received instant profits regardless of whether the Company achieved its objectives.

152.    From 1997 to 2006, Staples, with the knowledge, approval and participation of each of the Individual Defendants, for the purpose and with the effect of concealing the improper stock option backdating, filed with the SEC Form 4s that falsely reported the dates of Staples stock option grants to the Individual Defendants, as follows:

a.    Stemberg's Form 4s filed with the SEC on August 10, 1998, February 7, 2002, March 14, 2002, April 10, 2002, May 10, 2002, June 11, 2002, July 10, 2002, August 1, 2002, August 12, 2002, August 29, 2002 and January 29, 2004 falsely reported that stock options granted to Stemberg had been granted on September 23, 1994;

b.    Sargent's Form 4s filed with the SEC on April 9, 1999 and May 3, 1999 and September 25, 2003 falsely reported that stock options granted to Sargent had been granted on September 23, 1994;

c.    Vassalluzzo's Form 4s filed with the SEC on February 7, 2002, March 14, 2002, April 10, 2002, May 10, 2002 and June 11, 2002 falsely reported that stock options granted to Vassalluzzo had been granted on September 23, 1994;

d.    Parneros's Form 4 filed with the SEC on July 7, 2004 falsely reported that stock options granted to Parneros had been granted on September 23, 1994;

e.    Hickey's Form 4 filed with the SEC on April 10, 2001 falsely reported that stock options granted to Hickey had been granted on March 1, 1996;

f.    Parneros's Form 4 filed with the SEC on November 17, 2006 falsely reported that stock options granted to Parneros had been granted on December 1, 1996;

g.    Hoyt's Form 4s filed with the SEC on December 16, 1997 and June 11, 2002 falsely reported that stock options granted to Hoyt had been granted on August 28, 1997;

h.      Vassalluzzo's Form 4s filed with the SEC on January 14, 1998 and December 11, 2003 falsely reported that stock options granted to Vassalluzzo had been granted on August 28, 1997;

i.      Stemberg's Form 4s filed with the SEC on September 10, 1997, April 17, 2003, May 2, 2003, May 21, 2003, June 18, 2003, July 10, 2003, July 16, 2003, August 5, 2003 and August 22, 2003 falsely reported that stock options granted to Stemberg had been granted on August 28, 1997;

j.      Levitan's Form 4s filed with the SEC on December 16, 1997 and February 12, 2001 falsely reported that stock options granted to Levitan had been granted on August 28, 1997;

k.      Sargent's Form 4s filed with the SEC on December 16, 1997 and June 15, 2004 falsely reported that stock options granted to Sargent had been granted on August 28, 1997;

l.      Gentry's Form 4s filed with the SEC on December 16, 1997 and January 10, 2002 falsely reported that stock options granted to Gentry had been granted on August 28, 1997;

m.      Mahoney's Form 4s filed with the SEC on December 16, 1997 and May 28, 2004 falsely reported that stock options granted to Mahoney had been granted on August 28, 1997;

n.      Lewis's Form 4 filed with the SEC on October 10, 2001 falsely reported that stock options granted to Lewis had been granted on August 28, 1997;

o.      Hickey's Form 4 filed with the SEC on April 10, 2002 falsely reported that stock options granted to Hickey had been granted on August 28, 1997;

p.      Harsant's Form 4 filed with the SEC on June 11, 2002 falsely reported that stock options granted to Harsant had been granted on August 28, 1997;

q.      Vassalluzzo's Form 4 filed with the SEC on August 10, 1998 falsely reported that stock options granted to Vassalluzzo had been granted on July 1, 1998;

r.      Stemberg's Form 4s filed with the SEC on August 10, 1998, September 14, 2004, December 29, 2004, January 3, 2005, April 1, 2005, April 5, 2005, May 20, 2005, May 24, 2005, May 27, 2005 and June 3, 2005 falsely reported that stock options granted to Stemberg had been granted on July 1, 1998;

s.      Mayerson's Form 4 filed with the SEC on August 10, 1998 falsely reported that stock options granted to Mayerson had been granted on July 1, 1998;

t.      Levitan's Form 4 filed with the SEC on August 10, 1998 falsely reported that stock options granted to Levitan had been granted on July 1, 1998;

u.      Sargent's Form 4s filed with the SEC on August 10, 1998 and November 22, 2005 falsely reported that stock options granted to Sargent had been granted on July 1, 1998;

v.      Harsant's Form 4s filed with the SEC on August 10, 1998 and June 11, 2002 falsely reported that stock options granted to Harsant had been granted on July 1, 1998;

w.      Gentry's Form 4 filed with the SEC on August 10, 1998 falsely reported that stock options granted to Gentry had been granted on July 1, 1998;

x.      Mahoney's Form 4 filed with the SEC on August 10, 1998 falsely reported that stock options granted to Mahoney had been granted on July 1, 1998;

y.      Lewis's Form 4s filed with the SEC on August 10, 1998 and February 15, 2000 falsely reported that stock options granted to Lewis had been granted on July 1, 1998;

z.      Hoyt's Form 4 filed with the SEC on August 10, 1998 falsely reported that stock options granted to Hoyt had been granted on July 1, 1998;

aa.     Bingleman's Form 4 filed with the SEC on August 12, 1998 falsely reported that stock options granted to Bingleman had been granted on July 1, 1998;

bb.     Crosier's Form 4s filed with the SEC on August 10, 1998 and November 10, 1998 falsely reported that stock options granted to Crosier had been granted on July 1, 1998;

cc.    Peters's Form 4 filed with the SEC on August 10, 1998 falsely reported that stock options granted to Peters had been granted on July 1, 1998;

dd.    Light's Form 4 filed with the SEC on August 10, 1998 falsely reported that stock options granted to Light had been granted on July 1, 1998;

ee.    Doody's Form 4s filed with the SEC on November 23, 2005 and December 23, 2005 falsely reported that stock options granted to Doody had been granted on November 30, 1998;

ff.    Doody's Form 4 filed with the SEC on December 23, 2005 falsely reported that stock options granted to Doody had been granted on December 1, 1998;

gg.    Gentry's Form 4 filed with the SEC on July 10, 2000 falsely reported that stock options granted to Gentry had been granted on June 6, 2000;

hh.    Stemberg's Form 4s filed with the SEC on July 10, 2000, August 22, 2003, September 2, 2003, September 17, 2003, October 21, 2003, December 1, 2003 and May 27, 2004 falsely reported that stock options granted to Stemberg had been granted on June 6, 2000;

ii.    Levy's Form 4 filed with the SEC on July 10, 2000 falsely reported that stock options granted to Levy had been granted on June 6, 2000;

jj.    Levitan's Form 4 filed with the SEC on July 10, 2000 falsely reported that stock options granted to Levitan had been granted on June 6, 2000;

kk.    Hickey's Form 4 filed with the SEC on July 10, 2000 falsely reported that stock options granted to Hickey had been granted on June 6, 2000;

ll.    Harsant's Form 4s filed with the SEC on July 10, 2000 and June 11, 2002 falsely reported that stock options granted to Harsant had been granted on June 6, 2000;

mm.     Hoyt's Form 4 filed with the SEC on July 10, 2000 falsely reported that stock options granted to Hoyt had been granted on June 6, 2000;

nn.     Vassalluzzo's Form 4 filed with the SEC on July 10, 2000 falsely reported that stock options granted to Vassalluzzo had been granted on June 6, 2000;

oo.     VanWoerkom's Form 4s filed with the SEC on July 10, 2000 and September 25, 2003 falsely reported that stock options granted to VanWoerkom had been granted on June 6, 2000;

pp.     Sargent's Form 4 filed with the SEC on July 10, 2000 falsely reported that stock options granted to Sargent had been granted on June 6, 2000;

qq.     Lewis's Form 4s filed with the SEC on July 10, 2000, April 25, 2002 and July 12, 2002 falsely reported that stock options granted to Gentry had been granted on June 6, 2000;

rr.     Doody's Form 4s filed with the SEC on July 10, 2000 and March 24, 2006 falsely reported that stock options granted to Doody had been granted on June 6, 2000;

ss.     Light's Form 4 filed with the SEC on July 10, 2000 falsely reported that stock options granted to Light had been granted on June 6, 2000;

tt.     Crosier's Form 4 filed with the SEC on July 10, 2000 falsely reported that stock options granted to Crosier had been granted on June 6, 2000;

uu.     Peters's Form 4 filed with the SEC on July 10, 2000 falsely reported that stock options granted to Peters had been granted on June 6, 2000;

vv.     Moore's Form 4s filed with the SEC on July 10, 2000 and October 10, 2001 falsely reported that stock options granted to Moore had been granted on June 6, 2000;

ww.     Ellinger's Form 4s filed with the SEC on July 10, 2000 and December 10, 2001 falsely reported that stock options granted to Ellinger had been granted on June 6, 2000;

xx.   Mahoney's Form 4 filed with the SEC on November 18, 2005 falsely reported that stock options granted to Mahoney had been granted on June 6, 2000;

yy.   Harsant's Form 4s filed with the SEC on September 11, 2000 and June 11, 2002 falsely reported that stock options granted to Harsant had been granted on August 1, 2000;

zz.   Sargent's Form 4 filed with the SEC on January 10, 2002 falsely reported that stock options granted to Sargent had been granted on December 4, 2001;

aaa.   Sargent's Form 4s filed with the SEC on July 24, 2003 and December 22, 2006 falsely reported that stock options granted to Sargent had been granted on July 1, 2003;

bbb.   Vassalluzzo's Form 4 filed with the SEC on July 25, 2003 falsely reported that stock options granted to Vassalluzzo had been granted on July 1, 2003;

ccc.   Mahoney's Form 4s filed with the SEC on July 25, 2003 and December 22, 2006 falsely reported that stock options granted to Mahoney had been granted on July 1, 2003;

ddd.   Anderson's Form 4s filed with the SEC on July 25, 2003, June 3, 2005, July 6, 2005, August 3, 2005, September 9, 2005, October 4, 2005, November 11, 2005, December 2, 2005, January 4, 2006, February 3, 2006 and March 1, 2006 falsely reported that stock options granted to Anderson had been granted on July 1, 2003;

eee.   Parneros's Form 4s filed with the SEC on July 25, 2003 and December 22, 2006 falsely reported that stock options granted to Parneros had been granted on July 1, 2003;

fff.   Doody's Form 4s filed with the SEC on July 25, 2003 and December 22, 2006 falsely reported that stock options granted to Doody had been granted on July 1, 2003;

ggg.   VanWoerkom's Form 4s filed with the SEC on July 25, 2003 and December 22, 2006 falsely reported that stock options granted to VanWoerkom had been granted on July 1, 2003; and

hhh.   Nachbor's Form 4 filed with the SEC on July 25, 2003
falsely reported that stock options granted to Nachbor had
been granted on July 1, 2003.

153.   The Individual Defendants continued to conceal their foregoing conduct until
November 14, 2006, when Staples announced that it conducted a review of the Company's
historical stock option granting practices and recorded a $10.8 million expense to reflect the
cumulative impact of accounting errors due to the use of incorrect measurement dates.

### Individual Defendants' Insider Selling

154.   During the relevant period, certain of the Individual Defendants (collectively, the
"Insider Selling Defendants"), while in possession of materially adverse non-public information
regarding the backdating of stock options and the false financial statements resulting therefrom,
sold over $446.5 million of Staples stock, a significant portion of which was obtained through
the exercise of improperly backdated Staples stock options, as follows:

| Defendant | Dates of Sales | Proceeds |
|---|---|---|
| Stemberg | 12/12/96 – 06/02/05 | $189,067,230.48 |
| Vassalluzzo | 07/09/98 – 03/10/98 | $25,475,477.36 |
| Parneros | 12/10/02 – 11/17/06 | $4,011,774.57 |
| Sargent | 07/09/98 – 11/16/06 | $64,072,361.61 |
| Hickey | 05/18/00 – 03/07/02 | $774,827.38 |
| Mahoney | 07/09/98 – 03/07/06 | $34,384,497.00 |
| Hoyt | 07/09/98 – 05/23/02 | $6,861,358.10 |
| Levitan | 07/09/98 – 01/26/01 | $2,493,421.99 |
| Gentry | 07/09/98 – 12/27/01 | $7,061,841.98 |
| Lewis | 07/09/98 – 06/07/02 | $7,752,355.20 |
| Harsant | 04/14/98 – 06/20/02 | $7,173,655.14 |
| Bingleman | 07/24/98 – 06/19/00 | $9,030,126.37 |
| Crosier | 05/18/00 | $53,092.19 |
| Peters | 05/01/99 – 07/26/00 | $1,958,906.56 |
| Light | 09/06/01 | $211,934.10 |
| Doody | 04/18/01 – 09/20/06 | $14,036,887.92 |
| VanWoerkom | 09/06/01 – 03/07/06 | $2,650,203.54 |

| | | |
|---|---|---|
| Moore | 08/01/01 – 09/04/01 | $171,284.75 |
| Ellinger | 09/06/01 – 12/04/01 | $450,130.05 |
| Mayerson | 05/12/98 – 06/16/99 | $1,074,312.00 |
| Anderson | 03/28/01 – 03/01/06 | $25,140,636.69 |
| Burton | 03/29/01 – 07/01/04 | $5,095,795.67 |
| Moriarty | 07/24/98 – 03/29/06 | $9,719,289.86 |
| Nakasone | 12/02/97 – 11/26/04 | $10,612,647.29 |
| Trust | 08/07/98 – 12/08/06 | $11,849,238.50 |
| Walsh | 04/16/98 – 05/23/06 | $5,454,934.25 |
| **TOTAL** | **12/02/97 – 12/08/06** | **$446,638,220.55** |

## STAPLES' FALSE FINANCIAL REPORTING IN VIOLATION OF GAAP, SEC REGULATIONS AND IRS RULES AND REGULATIONS

155.    As a result of the Individual Defendants' improper backdating of stock options, the Individual Defendants caused Staples to violate GAAP, SEC regulations and IRS rules and regulations.

156.    Staples's financial results for 1994 through 2006 were included in reports filed with the SEC and in other shareholder reports. In these reports, the Individual Defendants represented that Staples's financial results were presented in a fair manner and in accordance with GAAP.

157.    The Individual Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

158.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time. Regulation S-X, to which the Company is subject as a registrant under the

Exchange Act, 17 C.F.R. § 210.4-01(a)(1), provides that financial statements filed with the SEC, which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.

## Violations of GAAP

159.    During the relevant period, the Individual Defendants caused the Company to understate its compensation expenses by not properly accounting for its stock options under GAAP and thus overstated the Company's net earnings.

160.    Under well-settled accounting principles in effect throughout the relevant period, Staples did not need to record an expense for stock options granted to employees at the current market price ("at the money").  The Company was, however, required to record an expense in its financial statements for any stock options granted below the current market price ("in the money").  In order to provide Staples executives and employees with far more lucrative "in the money" options, while avoiding having to inform shareholders about millions of dollars incurred by the Company in compensation expenses (and without paying the IRS millions of dollars in employment taxes), the Individual Defendants systematically falsified Company records to create the false appearance that stock options had been granted at the market price on an earlier date.

161.    Throughout the relevant period, Staples accounted for stock options using the intrinsic method described in APB 25.  Under APB 25, employers were required to record as an expense on their financial statements the "intrinsic value" of a fixed stock option on its "measurement date."  A stock option that is "in the money" on the measurement date has intrinsic value, and the difference between its exercise price and the quoted market price must be recorded as compensation expense to be recognized over the vesting period of the option.  Stock

options that are "at the money" or out-of-the-money on the measurement date need not be expensed.  Excluding non-employee directors, APB 25 required employers to record compensation expenses on stock options granted to non-employees irrespective of whether they were "in the money" or not on the date of grant.

## Staples's GAAP Violations Were Material

162.    Staples's false and misleading relevant period statements and omissions regarding its accounting were material, particularly in light of SEC guidance on materiality.  SEC Staff Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of materiality.  Among other items, SAB Topic 1M says: "A matter is 'material' if there is a substantial likelihood that a reasonable person would consider it important."  It also stresses that materiality requires qualitative, as well as quantitative, considerations.  For example, if a known misstatement would cause a significant market reaction that reaction should be taken into account in determining the materiality of the misstatement.

163.    SAB Topic 1M further states:

> Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –
>
> *        *        *
>
> whether the misstatement masks a change in earnings or other trends
>
> whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise
>
> *        *        *
>
> whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability.

164.    SAB Topic 1M also says that an intentional misstatement of even immaterial items may be illegal and constitute fraudulent financial reporting.

165.    Staples's misstatements satisfy these criteria and thus were material from both a quantitative and qualitative perspective.

**Staples's Financial Statements Violated Fundamental Concepts of GAAP**

166.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, which are described by the following statements:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶10);

(b)    The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(g)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business

72

situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

167.     Further, the undisclosed adverse information concealed by the Individual Defendants during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

### Staples's Financial Statements Violated SEC Regulations

168.     During the relevant period, the Individual Defendants caused Staples to violate SEC regulations by failing to disclose that the Company's senior executives had been granted backdated stock options.

169.     Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an issuer must furnish information required by Item 402 of Regulation S-K [17 C.F.R. § 229.303]. Item 402(b) and (c) require a company to provide both a Summary Compensation Table and an Option/SAR Grants table identifying the compensation of the named executive officers – the Company's CEO and its next four most highly paid executives.  Item 402 requires particularized disclosures involving a company's stock option grants in the last fiscal year.  In the summary compensation table, the issuer must identify in a column "other annual compensation" received by the named executives that is not properly categorized as salary or bonus, including any "[a]bove market or preferential earnings on restricted stock, options, SARs or deferred compensation" paid to the officer during the period.  Item 402(b)(2)(iii)(C)(2).  In the option grant table, the issuer must identify in a column "[t]he per-share exercise or base price of the options. . . . If such exercise or base price is less than the market price of the underlying security

on the date of grant, a separate, adjoining column shall be added showing market price on the date of grant. . . ."  Item 402(c)(2)(iv).

170.    The Individual Defendants caused Staples to violate SEC regulations by failing to disclose that the Company's named executive officers had been granted stock options with exercise prices below the market value on the date that the Board and the Compensation Committee approved the grant.

## Staples's Violations of IRS Rules and Regulations

171.    During the relevant period, the Individual Defendants further caused Staples to violate IRS rules and regulations due to its improper accounting for the backdated stock options. As a result, the Company's tax liabilities were understated, exposing Staples to potential amounts owed for back taxes, penalties and interest to the IRS for improperly reporting compensation.

172.    The Individual Defendants caused the Company to violate IRS Code § 162(m), which generally limits a publicly traded company's tax deductions for compensation paid to each of its named executive officers to $1 million unless the pay is determined to be "performance-based."  In order for compensation to be performance-based, the Compensation Committee must have set pre-established and objective performance goals.  The goals must then be approved by the shareholders. Section 162(m) defines stock options as performance-based provided they are issued at an exercise price that is no less than the fair market value of the stock on the date of the grant.  Accordingly, properly issued stock options do not have to be taken into account in calculating whether an executive's compensation has exceeded the $1 million compensation cap.

173.    Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie top executives' soaring pay packages more closely to a company's performance.  This change in

the tax law turned compensation practices for a company's top executives away from straight salary-based compensation to performance-based compensation, including stock options. According to former SEC Chairman Harvey Pitt: "What [162[m]] did was create incentives to find other forms of compensation so people could get over the $1 million threshold without running afoul of the code."

174.    The Individual Defendants caused Staples to violate IRS Code § 162(m) by providing backdated options to the Company's named executive officers, which were granted with exercise prices that were less than the fair market value of the stock on the date of the grant. As a result all of the income resulting from the exercise of the options must be included for purposes of calculating whether the named executive's compensation exceeds the $1 million cap for federal tax purposes.

175.    The Individual Defendants further caused the Company to violate IRS rules and regulations in order to avoid having to withhold income and FICA tax from its executives and employees upon the exercise of Staples's stock options by improperly accounting for its Nonqualified Stock Options ("NSOs") as Incentive Stock Options ("ISOs").

176.    ISOs are a form of equity compensation that may be provided to a company's employees.  ISOs are required to be granted at an exercise price that is no less than the fair market value of the stock on the date of the grant and are entitled to preferential tax treatment as they are not subject to income tax upon exercise of the options but only upon sale of the stock (except for the possible imposition of alternative minimum tax on the option spread at the time of exercise).  Stock options that do not qualify as ISOs are considered to be NSOs.  NSOs are not entitled to preferential treatment as they are subject to income tax and FICA withholding upon exercise.  As a result, a company that fails to withhold income tax and/or FICA upon the exercise

of NSOs by its employees would be liable for the amount of the income tax and FICA that the company failed to withhold upon exercise of the options, in addition to interest and penalties.

177.    By improperly treating its backdated options as ISOs, the Individual Defendants failed to provide proper income tax and FICA withholdings upon the exercise of its options by its executives and employees in violation of IRS rules and regulations.

178.    The chart below illustrates Staples's false and misleading fiscal year financial results which materially understated its compensation expenses and thus overstated its earnings:

| Fiscal Year Ended | Reported Net Income (Loss) | Reported Basic Earnings (Loss) Per Share |
|---|---|---|
| January 28, 1995 | $72.071 million | $0.21 |
| February 3, 1996 | $108.428 million | $0.28 |
| February 1, 1997 | $144.742 million | $0.36 |
| January 31, 1998 | $167.914 million | $0.41 |
| January 30, 1999 | $185.370 million | $0.43 |
| January 29, 2000 | $314.988 million | $0.42 |
| February 3, 2001 | $59.712 million | - |
| February 2, 2002 | $264.970 million | $0.40 |
| February 1, 2003 | $446.100 million | $0.96 |
| January 31, 2004 | $490.211 million | $1.01 |
| January 29, 2005 | $708.388 million | $0.95 |
| January 28, 2006 | $834.409 million | $1.14 |

179.    Meanwhile, the Individual Defendants were causing the Company to grant them millions of backdated stock options.  The Company's executives received a significant number of backdated stock options as compensation during the relevant period.

**INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES**

180.    In a misguided effort to attract and retain employees in a competitive environment, the Individual Defendants exceeded the bounds of the law and legitimate business

judgment by perpetrating their backdating scheme.  The Individual Defendants' misconduct was unjustifiable and constituted a gross breach of their fiduciary duties as officers and/or directors of the Company.  Specifically, the Individual Defendants breached their fiduciary duties by:

    a.    colluding with each other to backdate stock option grants;

    b.    colluding with each other to violate GAAP and Section 162(m);

    c.    colluding with each other to produce and disseminate to Staples shareholders and the market false financial statements that improperly recorded and accounted for the backdated stock option grants and concealed the improper backdating of stock options; and

    d.    colluding with each other to file false proxy statements, false financial statements and false Form 4s in order to conceal the improper backdating of stock options.

181.   The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly benefit the Individual Defendants at the expense of the Company.

182.   As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the additional compensation expenses and tax liabilities the Company has been required to incur, the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant, and the costs and expenses incurred in connection with the Company's internal investigation announced on November 14, 2006.

183.   In addition, certain of the Individual Defendants have exercised millions of Staples backdated stock options at improperly low prices and have then sold the shares for

substantial proceeds.  Consequently, the Individual Defendants have been unjustly enriched by garnering millions of dollars in illicit proceeds and depriving the Company of millions of dollars in payments that the Company should have received upon exercise of the stock options.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

184.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties, unjust enrichment, statutory violations and other violations of law.

185.    Plaintiffs are owners of Staples common stock and were owners of Staples common stock at all times relevant hereto.

186.    Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting their rights.

187.    As a result of the facts set forth herein, Plaintiffs have not made any demand on the Staples Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

188.    At the time this action was commenced, the Board consisted of ten directors: Defendants Sargent, Anderson, Barnes, Blank, Burton, Moriarty, Nakasone, Trust and Walsh, and Director Gary L. Crittenden.  Nine of the ten members of the Board, Defendants Sargent, Anderson, Barnes, Blank, Burton, Moriarty, Nakasone, Trust and Walsh, are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action.  Their positions during the relevant period are summarized in the table below:

| Defendant | Recipient of Backdated Stock Option Grants | Member of the Compensation Committee at the Time of Backdated Stock Option Grants | Member of the Audit Committee at the Time of Backdated Stock Option Grants | Insider Seller |
|---|---|---|---|---|
| Sargent | x | | | x |
| Anderson | x | | x | x |
| Barnes | | x | | |
| Blank | | x | | |
| Burton | | | x | x |
| Moriarty | | | | x |
| Nakasone | | x | | x |
| Trust | | x | | x |
| Walsh | | | x | x |

**Defendant Sargent**

189.   Defendant Sargent is interested in the transactions complained of herein because he directly and personally benefited from the backdating of stock options, as a recipient of backdated options granted on September 23, 1994, August 28, 1997, July 1, 1998, June 6, 2000, December 4, 2001 and July 1, 2003.   Sargent knowingly and deliberately participated in and approved the improper backdating of stock options and knowingly and deliberately participated in and approved the Company's filing of false financial statements and other false SEC filings, as alleged herein, and is therefore substantially likely to be held liable for the misconduct complained of herein.   Additionally, Sargent's current principal professional occupation is his position as Chairman and Chief Executive Officer.   In this position, Sargent has earned and stands to earn hundreds of thousands of dollars more in annual salary, bonuses and other compensation, all of which must be approved by Defendants Barnes, Blank and Burton, who are currently members of the Compensation Committee.   As a result of the foregoing, at the time this suit was commenced, Defendant Sargent was not capable of disinterestedly and independently considering a pre-suit demand to commence this litigation.

190.    Sargent is also directly interested in the stock option backdating that is the subject of this action as he received backdated stock options to purchase more than 2.8 million shares of Staples common stock.  Moreover, Sargent received more than $64 million in illegal proceeds from his sale of Staples stock.

## Defendant Anderson

191.    Defendant Anderson is interested in the transactions complained of herein because he directly and personally benefited from the backdating of stock options, as a recipient of backdated options granted July 1, 2003.  As a member of the Audit Committee from 1997 to 2001, Anderson knowingly and deliberately approved the filing of false financial statements and other false SEC filings.  Anderson knowingly and deliberately participated in and approved the improper backdating of stock options and knowingly and deliberately participated in and approved the Company's filing of false financial statements and other false SEC filings, as alleged herein, and is therefore substantially likely to be held liable for the misconduct complained of herein.  As a result of the foregoing, at the time this suit was commenced, Defendant Anderson was not capable of disinterestedly and independently considering a pre-suit demand to commence this litigation.

192.    Anderson is also directly interested in the stock option backdating that is the subject of this action as he received backdated stock options to purchase more than 180,000 shares of Staples common stock.  Moreover, Anderson received more than $25 million in illegal proceeds from his sale of Staples stock.

## Defendant Barnes

193.    Defendant Barnes is interested in the transactions complained of herein because she faces a substantial likelihood of being held liable for approving the backdated options as a

member of the Compensation Committee from 2003 to September 2007.  Barnes, as a member of

the Compensation Committee from 2003 to September 2007, was responsible for approving the

option grants to executive officers including the backdated stock option grant on July 1, 2003.

Barnes knowingly and deliberately participated in and approved and the improper backdating of

stock options.  By backdating these stock option grants, Barnes violated her duty of good faith

and loyalty, and faces a substantial likelihood of liability for her misconduct.  As a member of

the Audit Committee in 2002 and 2003, Barnes knowingly and deliberately participated in and

approved the Company's filing of false financial statements and other false SEC filings, as

alleged herein, and therefore is substantially likely to be held liable for the misconduct

complained of herein.  Moreover, by colluding with the Individual Defendants, as alleged herein,

Barnes has demonstrated that she is unable or unwilling to act independently of the Individual

Defendants.  Thus, at the time this suit was commenced, Defendant Barnes was not capable of

disinterestedly and independently considering a pre-suit demand to commence this litigation.

**Defendant Blank**

194.    Defendant Blank is interested in the transactions complained of herein because he

faces a substantial likelihood of being held liable for approving the backdated options as a

member of the Compensation Committee from 2001 to the present.  Blank, as a member of the

Compensation Committee from 2001 to the present, was responsible for approving the option

grants to executive officers including the backdated stock option grants on December 4, 2001

and July 1, 2003.  Blank knowingly and deliberately participated in and approved and the

improper backdating of stock options.  By backdating these stock option grants, Blank violated

his duty of good faith and loyalty, and faces a substantial likelihood of liability for his

misconduct.  As a director since 2001, Blank knowingly and deliberately participated in and

81

approved the Company's filing of false financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein.  Moreover, by colluding with the Individual Defendants, as alleged herein, Blank has demonstrated that he is unable or unwilling to act independently of the Individual Defendants.  Thus, at the time this suit was commenced, Defendant Blank was not capable of disinterestedly and independently considering a pre-suit demand to commence this litigation.

**Defendant Nakasone**

195.    Defendant Nakasone is interested in the transactions complained of herein because he faces a substantial likelihood of being held liable for approving the backdated options as a member of the Compensation Committee from at least 1994 to 2002, including as Chairman from at least 1994 to 1999.  Nakasone, as a member of the Compensation Committee from at least 1994 to 2002, including as Chairman from at least 1994 to 1999, was responsible for approving the option grants to executive officers including the backdated stock option grants on September 23, 1994, March 1, 1996, November 1, 1996, August 28, 1997, July 1, 1998, November 30, 1998, December 1, 1998, June 6, 2000, August 1, 2000 and December 4, 2001. Nakasone knowingly and deliberately participated in and approved and the improper backdating of stock options.  By backdating these stock option grants, Nakasone violated his duty of good faith and loyalty, and faces a substantial likelihood of liability for his misconduct.  As a director since 1986, Nakasone knowingly and deliberately participated in and approved the Company's filing of false financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein.  Moreover, by colluding with the Individual Defendants, as alleged herein, Nakasone has demonstrated that he is unable or unwilling to act independently of the Individual Defendants.  Thus, at the time this

suit was commenced, Defendant Nakasone was not capable of disinterestedly and independently considering a pre-suit demand to commence this litigation.

### Defendant Trust

196.    Defendant Trust is interested in the transactions complained of herein because he faces a substantial likelihood of being held liable for approving the backdated options as a member of the Compensation Committee from at least 1994 to 1995 and again from 1996 to 2003.  Nakasone, as a member of the Compensation Committee from at least 1994 to 1995 and again from 1996 to 2003, was responsible for approving the option grants to executive officers including the backdated stock option grants on September 23, 1994, March 1, 1996, November 1, 1996, August 28, 1997, July 1, 1998, November 30, 1998, December 1, 1998, June 6, 2000, August 1, 2000, December 4, 2001 and July 1, 2003.  Trust knowingly and deliberately participated in and approved and the improper backdating of stock options.  By backdating these stock option grants, Trust violated his duty of good faith and loyalty, and faces a substantial likelihood of liability for his misconduct.  As a director since 1987, Trust knowingly and deliberately participated in and approved the Company's filing of false financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein.  Moreover, by colluding with the Individual Defendants, as alleged herein, Trust has demonstrated that he is unable or unwilling to act independently of the Individual Defendants.  Thus, at the time this suit was commenced, Defendant Trust was not capable of disinterestedly and independently considering a pre-suit demand to commence this litigation.

**Defendant Burton**

197.    Defendant Burton is interested in the transactions complained of herein because she faces a substantial likelihood of being held liable for knowingly and deliberately participating in and approving the filing of false financial statements and other false SEC filings, as alleged herein.  Burton, as a member of the Audit Committee from at least 1994 to the present, knowingly and deliberately participated in and approved the Company's filing of false financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein.  Moreover, by colluding with the Individual Defendants, as alleged herein, Burton has demonstrated that she is unable or unwilling to act independently of the Individual Defendants.  Thus, at the time this suit was commenced, Defendant Burton was not capable of disinterestedly and independently considering a pre-suit demand to commence this litigation.

**Defendant Walsh**

198.    Defendant Walsh is interested in the transactions complained of herein because he faces a substantial likelihood of being held liable for knowingly and deliberately participating in and approving the filing of false financial statements and other false SEC filings, as alleged herein.  Walsh, as a member of the Audit Committee from at least 1994 to the present, knowingly and deliberately participated in and approved the Company's filing of false financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein.  Moreover, by colluding with the Individual Defendants, as alleged herein, Walsh has demonstrated that he is unable or unwilling to act independently of the Individual Defendants.  Thus, at the time this suit was commenced,

Defendant Walsh was not capable of disinterestedly and independently considering a pre-suit demand to commence this litigation.

### Defendant Moriarty

199.    Defendant Moriarty is interested in the transactions complained of herein because he faces a substantial likelihood of being held liable for knowingly and deliberately participating in and approving the filing of false financial statements and other false SEC filings, as alleged herein.   Moriarty, as a director since 1986, knowingly and deliberately participated in and approved the Company's filing of false financial statements and other false SEC filings, as alleged herein, and therefore is substantially likely to be held liable for the misconduct complained of herein.   Moreover, by colluding with the Individual Defendants, as alleged herein, Moriarty has demonstrated that he is unable or unwilling to act independently of the Individual Defendants.   Thus, at the time this suit was commenced, Defendant Moriarty was not capable of disinterestedly and independently considering a pre-suit demand to commence this litigation.

200.    Defendants Sargent, Anderson, Barnes, Blank, Burton, Moriarty, Nakasone, Trust and Walsh's positions on the Board during the relevant period are summarized in the table below:

| Defendant | Recipient of Backdated Stock Option Grants | Member of the Compensation Committee at the Time of Backdated Stock Option Grants | Member of the Audit Committee at the Time of Backdated Stock Option Grants | Insider Seller |
|---|---|---|---|---|
| Sargent | x | | | x |
| Anderson | x | | x | x |
| Barnes | | x | | |
| Blank | | x | | |
| Burton | | | x | x |
| Moriarty | | | | x |

| Nakasone | | x | | x |
|---|---|---|---|---|
| Trust | | x | | x |
| Walsh | | | x | x |

201.    Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment.  As represented in Staples's proxy statements, the stated purpose of the Company's shareholder-approved stock option plans is to "retain and reward executives who are responsible for leading Staples in achieving its business objectives."  However, by granting Staples stock options with backdated exercise prices, the Individual Defendants undermined the purpose of the Plans by awarding employees compensation that had intrinsic value regardless of Staples's stock performance.  In effect, this practice was nothing more than secret handouts to executives and employees at the expense of unsuspecting shareholders.

202.    The Individual Defendants could have achieved the stated purpose of "retain[ing] and reward[ing] executives who are responsible for leading Staples in achieving its business objectives" by granting those employees additional stock options under their incentive plans, or by granting stock options at a price less than the fair market value on the date of the grant and simply disclosing and expensing these grants.  Instead, the Individual Defendants motivated and retained Staples's employees by backdating stock option grants in violation of the Company's shareholder-approved stock option plans and improperly reporting these grants in their financial disclosures to improve their bottom line.

203.    The practice of backdating stock options is *ultra vires* and cannot be a valid exercise of business judgment because it has subjected Staples to potentially massive liability.  Staples will likely suffer tax liabilities for the additional compensation it will have to expense, and it has tarnished its reputation in the investment community through this deliberate and

calculated conduct.

## COUNT I

### Against Defendants Barnes, Blank, Nakasone and Trust for
### Violations of § 10(b) and Rule 10b-5 of the Securities and Exchange Act

204.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

205.    Throughout the relevant period, Defendants Barnes, Blank, Nakasone and Trust individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, intentionally or recklessly employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business which operated as a fraud and deceit upon the Company.

206.    Defendants Barnes, Blank, Nakasone and Trust, as directors of the Company and members of the Compensation Committee, are liable as direct participants in the wrongs complained of herein.   Through their positions of control and authority as directors of the Company and members of the Compensation Committee, each of Defendants Barnes, Blank, Nakasone and Trust was able to and did control the conduct complained of herein.

207.    Defendants Barnes, Blank, Nakasone and Trust acted with scienter in that they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.   Defendants Barnes, Blank, Nakasone and Trust, as directors of the Company and members of the Compensation Committee, were therefore directly responsible for the fraud alleged herein.

208.    The Company relied upon Defendants Barnes, Blank, Nakasone and Trust's fraud in granting certain of the Individual Defendants backdated options to purchase shares of the

Company's common stock, as alleged herein.

209.   As a direct and proximate result of Defendants Barnes, Blank, Nakasone and Trust's fraud, the Company has sustained millions of dollars in damages, as alleged herein.

## COUNT II

### Against Defendants Barnes, Blank, Nakasone, Trust, Anderson, Burton and Walsh  for Violations of § 14(a) of the Securities Exchange Act

210.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

211.   Rule 14-A-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14-A-9.

212.   The proxy statements described herein violated § 14(a) and Rule 14-A-9 because they omitted material facts, including the fact that Defendants Barnes, Blank, Nakasone, Trust, Anderson, Burton and Walsh were causing Staples to engage in an option backdating scheme, a fact which Barnes, Blank, Nakasone, Trust, Anderson, Burton and Walsh were aware of and participated in from at least 1994 to 2003.

213.   In the exercise of reasonable care, Barnes, Blank, Nakasone, Trust, Anderson, Burton and Walsh should have known that the proxy statements were materially false and misleading.

214.   The misrepresentations and omissions in the proxy statements were material.  The proxy statements were an essential link in the accomplishment of the continuation of Barnes, Blank, Nakasone, Trust, Anderson, Burton, and Walsh's unlawful stock option backdating

scheme, as revelations of the truth would have immediately thwarted a continuation of the shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

215.    The Company was damaged as a result of the material misrepresentations and omissions in the Proxy Statements.

## COUNT III

### Against Barnes, Blank, Nakasone, Trust, Anderson, Burton and Walsh For Violations of § 20(a) of the Securities Exchange Act

216.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

217.    Defendants Barnes, Blank, Nakasone, Trust, Anderson, Burton and Walsh, by virtue of their positions with Staples and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Staples within the meaning of § 20(a) of the Exchange Act. They had the power and influence and exercised the same to cause Staples to engage in the illegal conduct and practices complained of herein.

## COUNT IV

### Against the Individual Defendants for Accounting

218.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

219.    As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

220.    As alleged in detail herein, the Individual Defendants breached their fiduciary

duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain other officers and directors of the Company and cover up their misconduct.

221.    The Individual Defendants possess complete and unfettered control over their improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants.

222.    As a result of the Individual Defendants' misconduct, Staples has been damaged financially and is entitled to a recovery as a result thereof.

223.    Plaintiffs demand an accounting be made of all stock option grants made to any of the Individual Defendants, including, but not limited to, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the dates the stock options were exercised, as well as the disposition of any proceeds received by any of the Individual Defendants via sale or other exercise of the grants.

## COUNT V

### Against the Individual Defendants for
### Breach of Fiduciary Duty and/or Aiding and Abetting

224.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

225.    As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

226.    As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to

themselves and/or certain other officers and directors of the Company and cover up their misconduct.

227.     In breach of their fiduciary duties of loyalty and good faith, the Individual Defendants agreed to and did participate with and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets to themselves and/or other Company insiders.

228.     The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, it was intended to and did, unduly benefit the recipients of the backdated options at the expense of the Company.

229.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, as alleged herein.

## COUNT VI

### Against the Individual Defendants
### for Unjust Enrichment

230.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

231.     The Individual Defendants were unjustly enriched by their receipt and retention of backdated stock option grants and the proceeds they received through exercising backdated Staples stock options, as alleged herein and it would be unconscionable to allow them to retain the benefits thereof.

232.     To remedy the Individual Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such stock options that have been exercised, sold, pledged or otherwise monetized.

## COUNT VII

### Against the Individual Defendants
### for Rescission

233.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above as though fully set forth herein.

234.    As a result of the acts alleged herein, the stock option contracts between the Individual Defendants and the Company entered into during the relevant period were obtained through the Individual Defendants' fraud, deceit and abuse of control.  Further, the backdated Staples stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the Company's shareholder-approved stock option plans.

235.    All contracts which provide for stock option grants to the Individual Defendants and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executor contracts cancelled and declared void.

## COUNT VIII

### Against the Individual Defendants
### for Corporate Waste

236.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

237.    By failing to properly consider the interests of the Company and its shareholders, by failing to conduct proper supervision and by giving away millions of dollars to certain of the Individual Defendants via the stock option backdating scheme, the Individual Defendants have caused Staples to waste valuable corporate assets.

238.   As a result of the Individual Defendants' corporate waste, they are liable to the

Company.

WHEREFORE, Plaintiffs demand judgment as follows:

A.   Against all of the Individual Defendants and in favor of the
Company for the amount of damages sustained by the
Company as a result of the Individual Defendants' misconduct;

B.   Ordering the Individual Defendants to disgorge to the
Company all of the backdated stock options they received,
including the proceeds of any such options that have been
exercised, sold, pledged or otherwise monetized, and imposing
a constructive trust thereover;

C.   Granting appropriate equitable relief to remedy Individual
Defendants' breaches of fiduciary duties;

D.   Directing Staples to take all necessary to take all necessary
actions to reform and improve its corporate governance and
internal control procedures to comply with applicable law,
including, but not limited to, putting forward for a shareholder
vote resolutions for amendments to the Company's By-Laws or
Articles of Incorporation and taking such other action, as may
be necessary, before shareholders for a vote;

E.   Awarding to Plaintiffs the costs and disbursements of the
action, including reasonable attorneys' fees, accountants' and
experts' fees, costs and expenses; and

F.   Granting such other and further relief as the Court deems just
and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury.

Dated: October 11, 2007                    Respectfully submitted,

                                           **GILMAN AND PASTOR, LLP**

                                           _/s/ David Pastor_____
                                           David Pastor (BBO #391000)
                                           225 Franklin Street, 16th Floor
                                           Boston, MA  02110
                                           Telephone:  (617) 742-9700

                                           *Liaison Counsel*

**SCHIFFRIN BARROWAY TOPAZ**          **BARRACK, RODOS & BACINE**
**& KESSLER, LLP**                     Daniel E. Bacine
Eric Zagar                             Jeffrey W. Golan
Michael J. Hynes                       Chad A. Carder
Alison K. Clark                        3300 Two Commerce Square
280 King of Prussia Road               2001 Market Street
Radnor, PA 19087                       Philadelphia, PA 19103
Telephone: (610) 667-7706              Telephone: (215) 963-0600
Facsimile: (610) 667-7056              Facsimile: (215) 963-0838

*Co-Lead Counsel for Plaintiffs*       *Co-Lead Counsel for Plaintiffs*