UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| ANN WINTERS and LABORERS' INTERNATIONAL UNION OF NORTH AMERICA NATIONAL (INDUSTRIAL) PENSION FUND, derivatively on behalf of nominal defendant STAPLES, INC. | ) ) ) ) ) ) |  |
|  | ) | CIVIL ACTION |
| Plaintiffs, | ) | NO. 07-10193-WGY |
|  | ) |  |
|  | ) |  |
| THOMAS G. STEMBERG, MARTIN E HANAKA, JOHN B. WILSON, LOUIS R. PEPI, JOSEPH S. VASSALLUZZO, DEMOS PARNEROS, RONALD L. SARGENT, PATRICK HICKEY, JOHN J. MAHONEY, SUSAN S. HOYT, JEFFERY L. LEVITAN, RICHARD R. GENTRY, JEANNE B. LEWIS, EDWARD C. HARSANT, JOHN C. BINGLEMAN, DAVID B. CROSIER, JAMES C. PETERS, BRIAN T. LIGHT, JOSEPH G. DOODY, JACQUES LEVY, JACK VANWOERKOM, ROBERT J. MOORE, DEBORAH G. ELLINGER, ROBERT K. MAYERSON, JEFFREY E. NACHBOR, BASIL L. ANDERSON, BRENDA C. BARNES, ARTHUR M. BLANK, MARY ELIZABETH BURTON, ROWLAND T. MORIARTY, ROBERT C. NAKASONE, MARTIN TRUST AND PAUL F. WALSH | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
|  | ) |  |
| Defendants. | ) |  |
|_____ | ) |  |

MEMORANDUM AND ORDER

YOUNG, D.J.                                    January 4, 2008

The plaintiffs, Ann Winters ("Winters") and Laborers'

International Union of North America National (Industrial)

Pension Fund ("LIUNA") (collectively, "Plaintiffs"), bring a

shareholder's derivative action for the benefit of Staples, Inc. ("Staples") against the defendants, Thomas G. Stemberg, Martin E. Hanaka, John B. Wilson, Louis R. Pepi, Joseph S. Vassalluzzo, Demos Parneros, Ronald L. Sargent, Patrick Hickey, John J. Mahoney, Susan S. Hoyt, Jeffery L. Levitan, Richard R. Gentry, Jeanne B. Lewis, Edward C. Harsant, John C. Bingleman, David B. Crosier, James C. Peters, Brian T. Light, Joseph G. Doody, Jaques Levy, Jack VanWoerkom, Robert J. Moore, Deborah G. Ellinger, Robert K. Mayerson, Jeffrey E. Nachbor, Basil L. Anderson, Brenda C. Barnes, Arthur M. Blank, Mary Elizabeth Burton, Rowland T. Moriarity, Robert C. Nakasone, Martin Trust, and Paul F. Walsh (collectively, "Defendants").  The Plaintiffs assert common law claims of breach of fiduciary duty, unjust enrichment, and waste as well as claims pursuant to the Securities and Exchange Act of 1934 ("Exchange Act") based upon allegedly fraudulent and unlawful actions taken by the officers and directors of Staples.  Specifically, the Plaintiffs allege that between 1994 and 2003, corporate officers and directors engaged in a scheme to "backdate" stock options in violation of corporate stock option policies.

The Defendants move to dismiss the complaint, asserting (1) that the Plaintiffs lack standing to bring claims for stock options granted before February 1999; (2) that the statutory claims are time-barred under sections 10(b), 14(a), and 20(a) of the Securities and Exchange Act; (3) that the Plaintiffs have not complied with the demand requirement for shareholder derivative suits delineated by Federal Rule of Civil Procedure 23.1; and (4) that the Plaintiffs fail to satisfy the heightened pleading

standards required for claims that allege securities fraud, rendering the complaint insufficient under Federal Rule of Civil Procedure 9(b) and 12(b)(6).

## I. Background

### A. Jurisdiction

Because the Plaintiffs allege violations of the Securities and Exchange Act of 1934, the Court here has federal question jurisdiction pursuant to 28 U.S.C. § 1331.  The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the remaining claims, insofar as they are part of the same case or controversy from which the federal claim arises.

### B. Facts

For the purposes of a motion to dismiss, this Court accepts allegations in the complaint as true and draws all inferences in favor of the plaintiff.  Garrett v. Tandy Corp., 295 F.3d 94, 97 (1st Cir. 2002).  The facts below are recited in light of this standard.

A stock option is the right to purchase stock in a corporation for a specified period of time at a fixed price (the "exercise price").  Am. Compl. [Doc. 35] ¶ 3.  When the market price exceeds the exercise price, an option holder can profit by exercising his option, purchasing stock from the corporation, and reselling it at the (higher) market price.  See id.  The exercise

price generally equals the stock's market price on the date that the stock option is granted.  <u>Id.</u>  In order to increase the value of stock options, however, "backdating" is sometimes used. Instead of recording the date on which the option was actually granted, the corporation manipulates the option by listing an earlier date on which the market price of the stock was lower, which accordingly sets a lower (and more advantageous for the option holder) exercise price.  <u>See</u> <u>id.</u> ¶¶ 3-4.

Staples, a Delaware corporation with its principal executive offices in Framingham, Massachusetts, <u>id.</u> ¶ 23, grants stock options to strengthen its ability to attract and retain key officers, senior managers, and employees who are expected to contribute to the company's growth and success.  <u>Id.</u> ¶¶ 9, 12, 75.  It does so pursuant to two stockholder-approved plans: the 1987 Stock Option Plan and the 1992 Equity Incentive Plan (collectively, "the Plans").  <u>Id.</u> ¶ 74.  The Plans state that the exercise price of a stock option "may not be less than 100% of the fair market value of the Company's Common Stock" on the date of the grant.  <u>Id.</u>  ¶¶ 77, 80.  Fair market value is defined as "the last reported sale price per share of such series of Common Stock on the Nasdaq National Market on the date of grant."  <u>Id.</u> ¶ 80.  Staples's Compensation Committee has the sole authority to

select the date on which a stock option is granted.[1]  Id. ¶ 87.
Its decisions are made with the knowledge and approval of the
Board of Directors ("Board").  Id. ¶ 83.  Between 1994 to 2003,
the Compensation Committee approved fifty-one stock option
grants.  Id. ¶ 85.  Of these, eleven coincided with dates having
particularly low stock prices.[2]  Id.

In 2006, the practice of backdating stock options was
publicly identified, spurring the Securities and Exchange
Commission ("SEC") to investigate the phenomenon.  See id. ¶¶ 5,
10.  Staples was not a target of any government inquiry, but it,
like many other companies, decided to conduct an internal review
of its accounting procedures.  See id. ¶ 13, 70.  On November 14,
2006, Staples released the results of its review of stock option
granting practices from 1997 to the third quarter of 2006.  Id. ¶
13.  As a result of the audit, Staples "recorded a $10.8 million
expense ($8.6 million net of taxes) . . . to reflect the
cumulative impact of accounting errors due to the use of
incorrect measurement dates" with regard to stock-based
compensation.  Id.  Staples, however, "concluded that the use of

---

[1] The Compensation Committee also has other duties including,
inter alia, setting the compensation levels for executive
officers.  Am. Compl. ¶ 83.

[2] Eight of the grants were recorded as having been made at or
near one of the lowest prices of the month, two were recorded as
having been made at or near the lowest prices of the quarter, and
one preceded a substantial rise in the price of Staples's stock.
Am. Compl. ¶ 85.

incorrect measurement dates was not the result of intentional wrongdoing and has taken steps to improve the controls over its option granting processes." Id.

The Plaintiffs allege that this report, along with the fact that eleven stock option grants coincided with particularly low stock prices, demonstrates that the officers and directors of Staples engaged in intentional backdating.[3] See id. ¶ 13, 109. Additionally, the Plaintiffs allege that Staples understated its compensation expenses and overstated its net income because it did not report the backdated stock options when the Board approved or signed Staples's proxy statements and annual and quarterly reports, which were filed with the SEC and distributed to shareholders and the public, during the relevant period. Id. ¶¶ 113, 121.

Furthermore, the Plaintiffs allege that the Defendants' backdating scheme caused Staples to violate well-settled

---

[3] The Plaintiffs also point to a Form 4 filed with the SEC as further proof of backdating. See Am. Compl. ¶ 112. The Sarbanes-Oxley Act requires that all stock option grants be reported to the SEC within two days. The Form 4, which satisfies this requirement, was filed in relation to stock options purportedly granted on July 1, 2003; however, it was filed well beyond the two-day window provided for by the Sarbanes-Oxley Act, specifically, on July 24, 2003. Id. ¶ 152. Staples later filed a corrected exercise price for this stock option, but the corrected exercise price can be traced not to the market price of the stock on July 1 but July 10, nine days after the stock grant was purportedly made. Id. ¶¶ 14, 112. Furthermore, researchers believe that late Form 4 filings can be a sign of stock option backdating. Id. ¶ 106.

accounting principles (GAAP), leading to material false and misleading statements. Id. ¶ 155, 158, 162. Specifically, although Staples need not record an expense for stock options granted to employees at the current market price, it is required to record an expense in its financial statements for any stock option granted below the current market price. Id. ¶ 160. Similarly, the Plaintiffs allege the Defendants caused Staples to violate SEC regulations insofar as it failed to disclose in its filings with that body that its executive officers had been granted stock options with exercise prices below the market value on the date of grant. Id. ¶¶ 168-70.

Finally, the Plaintiffs allege the Defendants caused Staples to violate IRS Code section 162(m), which limits a publicly traded company's tax deductions for compensation paid to named executive officers that is not "performance-based." Id. ¶ 172. Although the Compensation Committee characterizes the stock options as a program designed to reward employees for "achieving business objectives," the Plaintiffs assert that backdating produces instant profits regardless of the performance of the individuals to whom the options are granted, id. ¶ 151, and thus that Staples took deductions for which it was not eligible, resulting in potential back taxes, penalties, and interest, id. ¶ 171.

C.   **Parties**

The Plaintiffs are Staples stockholders.  Winters purchased common stock in February 1999 and continuously has held stock in the company since that time.  Id. ¶ 21.  LIUNA purchased common stock in September 2003 and continuously has held stock since that time.  Id. ¶ 22.

The Defendants include those individuals the Plaintiffs allege approved of or received the backdated stock options. These include members of the Board (some of whom served on the Compensation Committee) and twenty-five company executives.  Id. ¶¶ 1, 24-58.  The Defendants collectively sold over $446,500,000 in stock, a significant portion of which was obtained through the allegedly backdated stock options.  Id. ¶ 154.  Some of the defendants – specifically, Stemberg, Hanaka, Wilson, Sargent, Hickey, Mahoney, Mayerson, Nachbor, Anderson, Barnes, Blank, Burton, Moriarity, Nakasone, Trust, and Walsh – also signed SEC forms that inaccurately reported expenses and income of the corporation.  Id. ¶¶ 123-124.

**D. Procedural Background**

On February 1, 2007, Winters filed a shareholder derivative complaint on behalf of Staples.  Compl. [Doc. No. 1].  On March 7, 2007, LIUNA initiated a second suit by filing its own shareholder derivative complaint.  Laborers' Int'l Union of North Am. Nat'l (Indus.) Pension Fund v. Stemberg, et. al., 07-10462 (D. Mass. filed March 7, 2007)[Doc. 1].  By order dated March 26,

2007, this Court consolidated the LIUNA action with the Winters action, whereby all future proceedings were to be filed in the Winters case.

On July 2, 2007, the Defendants filed their motion to dismiss. Defs. Mot. Dismiss [Doc. No. 17].  On September 27, this Court heard oral argument on the motion and permitted the Plaintiffs to amend their complaints in order to remedy their perceived deficiencies.  The Plaintiffs filed the amended complaint, which is the subject of this memorandum, on October 11.

A parallel shareholder derivative suit on behalf of Staples is pending in the Delaware Court of Chancery.  See Conrad v. Blank, et al., C.A. No. 2611-VCL, 2007 WL 2593540 (Del. Ch. Sept. 7, 2007) (denying in part defendants' motion to dismiss).  In December 2006, Donna Conrad ("Conrad") filed a complaint against current and former directors and officers of Staples alleging breach of fiduciary duty and other common law causes of action based upon stock option backdating.  Id. at *1.  Twenty-one of Staples's directors and officers are named defendants in both the Winters and Conrad suits.[4]

_____

[4] These individuals are Stemberg, Hanaka, Wilson, Pepi, Vassalluzzo, Sargent, Hickey, Mahoney, Hoyt, Bingleman, Vanwoerkom, Mayerson, Nachbor, Anderson, Barnes, Blank, Burton, Moriarity, Nakason, Trust, and Walsh.  However, the parties stipulated to the dismissal of Bingleman, Hickey, Hoyt, Pepi, and Wilson from the Conrad action.  Defs. Mot. Dismiss Ex. 4 at 1 n. 1.  One Conrad defendant, James E. Flavin, was not named in the

On March 1, 2007, the <u>Conrad</u> defendants filed a motion to
dismiss, arguing that Conrad had not initiated a demand required
under Delaware Court of Chancery Rule 23.1 and that she also
lacked standing to bring a portion of her claims.  <u>Conrad</u>, 2007
WL 2593540, at *2.  Conrad argued a demand was excused because
the defendants were conflicted and unable to make an independent
determination in response to the demand.  <u>Id.</u>  The Court of
Chancery held that Conrad adequately alleged that a demand would
be futile and denied the defendants' motion to dismiss on that
ground.  <u>Id.</u> at *11.  The Chancery Court, however, conditionally
held that Conrad lacked standing as to conduct that occurred
before she purchased stock in 1998, contingent on another
stockholder who has standing to contest the earlier conduct
intervening in the suit.  <u>Id.</u> at *2.

## III. DISCUSSION

### A. Standard for Analysis

In addressing a motion to dismiss, the plaintiff's
allegations are taken as true, and the Court must construe the
complaint in the light most favorable to the plaintiff.  <u>Jenkins</u>
v. <u>McKeithen</u>, 395 U.S. 411, 421 (1969).  The analysis for a
motion to dismiss does not change because a heightened pleading
standard is imposed.  <u>Aldridge</u> v. <u>A.T. Cross Corp.</u>, 284 F.3d 72,
78 (1st Cir. 2002); <u>see also</u> <u>Bell</u> <u>Atlantic</u> v. <u>Twombly</u>, 127 S.Ct.

─────────────────────

instant action.

1955, 1964-66 (2007); <u>Brown</u> v. <u>Sweeney</u>, – F. Supp. 2d –, 2007 WL
4355891, *2-3 (D. Mass. Nov. 1, 2007).  A court must still draw
all reasonable inferences from the allegations of the complaint
to the benefit of the plaintiff when determining whether the
plaintiff has satisfied the more stringent pleading requirements.
<u>Aldridge</u>, 395 U.S. at 78.

The Plaintiffs here must meet two heightened pleading
standards.  Federal Rule of Civil Procedure 9(b) requires that
complaints alleging fraud "state with particularity the
circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  In
addition, the Private Securities Litigation Reform Act ("PSLRA")
must be satisfied.  Under this statute, a complaint alleging a
misleading statement or omission must "specify each statement
alleged to have been misleading, the reason or reasons why the
statement is misleading, and, if an allegation regarding the
statement or omission is made on information and belief, the
complaint shall state with particularity all facts on which that
belief is formed."  15 U.S.C. § 78u-4(b)(1).  To comply with this
mandate, a plaintiff must specify the identity of the speaker,
where and when the statement was made, and why the statement was
fraudulent.  <u>Fitzer</u> v. <u>Security Dynamics Techs., Inc.</u>, 119 F.
Supp. 2d 12, 18 (D. Mass. 2000).  Complaints will fail for
insufficient specificity if they are based on information and
belief but fail to identify the source of information and reason

for belief.[5]  Id.

Additionally, the PSLRA requires that, for those causes of action which require proof of scienter, the plaintiff plead with particularity facts "giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  In determining whether the plaintiff has satisfied this requirement, courts must evaluate the inferences that can be drawn from the facts taken collectively, rather than by reference to "individual allegation[s], scrutinized in isolation." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2509 (2007).  At the same time, courts must take into account "plausible nonculpable explanations for the defendant's conduct," which detract from the strength of the inference of scienter. Id.  Ultimately, in order for the complaint to survive, a court must conclude that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Id. at 2510.

Having mapped the legal landscape, the Court now addresses the Defendants' arguments with respect to the amended complaint.

   **B. Standing**

---

[5] In the First Circuit, the PSLRA analysis largely merges with the Rule 9(b) analysis, as the PSLRA's pleading standard "is congruent and consistent with the pre-existing standards" of the First Circuit, which has been "notably strict and rigorous in applying" Rule 9(b).  Greebel v. FTP Software, Inc., 194 F.3d 185, 193 (1st Cir. 1999).

Section 327 of the Delaware Code requires that "any derivative suit instituted by a stockholder of a corporation . . . shall . . . aver[] in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains . . . ."  8 Del. C. § 327.  The stock must also be held throughout the litigation.  See Ryan v. Gifford, 918 A.2d 341, 359 (Del. Ch. 2007).  The Plaintiffs, therefore, must have held stock from 1994 to present in order to challenge all eleven stock option grants relied upon in the complaint.[6]

The original complaint failed to identify at what specific times the Plaintiffs were Staples shareholders.  When the Defendants raised this issue at oral argument, the Plaintiffs explained that they did not hold stock until February 1999.  The Court cautioned the Plaintiffs that standing was an issue with regard to claims based on behavior prior to that time, and the Plaintiffs responded that they would locate additional shareholders who purchased stock prior to February 1999 to intervene.  The Plaintiffs, however, have not done so.  As a result, the Plaintiffs lack standing to challenge the conduct taken by the Defendants prior to February 1999 because neither

---

[6] This conclusion is bolstered by the Delaware Court of Chancery's decision to limit Conrad's claims to those relating to stock options granted after 1998, as Conrad did not own stock prior to that time.  Conrad, 2007 WL 2593540, at *1.

Winters nor LUINA held stock before this time.  The Plaintiffs here thus may challenge only the stock option grants made on June 6, 2000, August 1, 2000, December 4, 2001, and July 1, 2003; the Plaintiffs may also challenge only the proxy statements issued April 19, 1999, May 9, 2001, May 3, 2002, and May 5, 2004.

**C. Time-bar Defense**

Prior to 2002, private securities claims under section 10(b) were barred if they were not brought within the earlier of one year after the discovery of the fact constituting the violation or three years after such violation.  See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364 (1991).  The Sarbanes-Oxley Act altered the statute of repose with regard to these claims, extending it to the earlier of two years after the discovery of the facts constituting the violation or five years after the violation.  Sarbanes-Oxley Act of 2002, PL 107-204 § 804(a)(2)(b), 116 Stat. 745, 801 (2002) (codified at 28 U.S.C. § 1658(b)).  The Sarbanes-Oxley Act, however, did not affect the time limits for bringing actions arising under other securities laws, including section 14(a).  See In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189, 196-97 (S.D.N.Y. 2003). Accordingly, the statute of repose for the Plaintiffs' claims under section 14(a) remains the earlier of one year after the discovery of the fact constituting the violation or three years after such violation.

### 1. Section 10(b) and 20(a) Claims

Winters filed her complaint on February 1, 2007.  The Defendants argue that, under Sarbanes-Oxley, the Plaintiffs cannot assert section 10(b) claims based on stock option grants prior to February 2, 2002, as any violation arising out of those grants would have occurred more than five years before the suit was instituted.  Defs. Mem. Supp. [Doc. 18] at 16-17.

The Defendants rely upon this Court's decision in Continental Bank, National Association v. Ludlow, 777 F. Supp. 92, 102 (D. Mass 1991), for the proposition that the five-year statute of repose runs from the exact date that the stock option was granted.  Defs. Mem. Supp. at 17.  The Defendants are incorrect.  In Continental, misrepresentations about the true value of the security (there, Seabrook Bonds) occurred in 1984, 1985, and 1987.  Id. at 102.  This Court determined that the plaintiff's claim was time-barred, ruling that "the repose period begins when the last alleged misrepresentation was made by any of the [p]articipants." Id. (emphasis added).

Here, the Plaintiffs assert that the Defendants' actions caused Staples to make misrepresentations in a series of financial statements, the last of which was filed on February 28, 2006.  Pls. Mem. Opp. [Doc. No. 19] at 16.  Under Continental, therefore, the five-year statue of repose did not begin to run until that date.  The argument that the Plaintiffs should have

filed suit sooner given the circumstances of this case is incredible.  Backdating was a practice unknown to the investing public in general until it was brought to light by press reports and academic research in early 2006.  Am. Compl. ¶¶ 5-6. Furthermore, Staples shareholders arguably did not have notice that Staples itself engaged in backdating and that its previous financial reports thus contained inaccuracies until Staples released the results of its internal audit in November 2006. This Court's conclusion, which follows Continental, best serves the policy behind the statue of repose for this type of securities fraud claim and is compatible with this District's recent decisions.  See, e.g., In re Stone & Webster, Inc. Sec. Litigation, 2006 WL 1738348, *3 (D. Mass. June 23, 2006) (Zobel, J.) ("The three-year period of repose begins to run on the date that the fraudulent activity occurred, which in securities fraud cases is the date of the defendant's last fraudulent misstatement"); Quaak v. Dexia S.A., 357 F. Supp. 2d 330, 337 (D. Mass. 2005) (Saris, J.).  Accordingly, the Plaintiffs' section 10(b) claims are not time-barred by the five-year statute of repose, insofar as the complaint was filed less than one year after the period began.

A section 20(a) claim is dependent on establishing an "independent violation of the securities laws."  In re Focus Enhancements, Inc. Sec. Litig., 309 F. Supp. 2d 134, 157 (D.

Mass. 2001) (Woodlock, J.).  Because this Court concludes that
the section 10(b) claims are not time-barred, the Plaintiffs'
section 20(a) claim also is timely.

          2. Section 14(a) Claims

     Because Winters filed her complaint on February 1, 2007, any
alleged section 14(a) violations that were discovered before
February 2, 2006, or that occurred before February 2, 2004, are
time-barred.  The Plaintiffs cite as a basis for their claim a
misrepresentation that allegedly occurred on May 5, 2004, when
Staples filed a proxy statement that stated that stock options
given to some Defendants were granted on July 1, 2003 at an
exercise price equal to the "fair market value per share of
Staples common stock on the date of the grant."  Pls. Opp. Mem.
at 17.

     The Defendants argue that the one-year, rather than three-
year, time limit should apply and bar the section 14(a) cause of
action based on this proxy statement because the Plaintiffs could
have discovered the misrepresentation prior to February 2, 2006.
Def. Mem. Supp. at 17.  As discussed above, however, and as the
Plaintiffs illustrate throughout the complaint, the concept of
backdating was a practice unknown to shareholders and the general
public prior to 2006.  This Court concludes that the three-year
period applies and that, therefore, the section 14(a) claims
based on the May 5, 2004 proxy statement are not time-barred.

**D. Failure to Demand**

A derivative complaint must "state with particularity any effort made by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members[,] and the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). The existence and satisfaction of a demand requirement is a substantive issue governed by the law of the state of incorporation. Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 108-109 (1991).

Staples is incorporated in Delaware. Under the law of that state, when the challenged decision is that of the Board in place at the time the complaint is filed, failure to make a demand may be excused if a plaintiff "can raise a reason to doubt that: (1) a majority of the board is disinterested or independent or (2) the challenged acts were the product of the board's valid exercise of business judgment." Ryan, 918 A.2d at 352; see also Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984). The Plaintiffs acknowledge no demand was made on the Board before instituting this action, Am. Compl. ¶¶ 187-88, but assert their failure is one that should be excused.

First, the Plaintiffs allege that the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action. Id. ¶ 187. Specifically, at

the time this action commenced, the Board consisted of two
defendants who personally received alleged backdated stock
options and four defendants who were members of the Compensation
Committee that allegedly failed to administer the Plans in a
proper manner. Id. ¶ 188. Another three Board members are
defendants who participated in or approved the filing of
inaccurate reports and statements with the SEC. Id. ¶¶ 188, 191,
197-98. The Plaintiffs also argue that the demand is excused
because the misconduct was not an exercise of good faith business
judgment. Id. ¶ 201. The Plaintiffs contend that the backdated
stock options were ultra vires and undermined the
shareholder-approved Plans. Id. ¶¶ 201-203.

The Defendants requested that this Court stay consideration
of the demand requirement until after the Delaware Court of
Chancery rendered its decision on the same issue in Conrad.
Defs. Mem. Supp. at 19. The Court of Chancery has done so,
agreeing with Conrad that the demand requirement was excused.
Specifically, the Court of Chancery concluded that two Board
members who received backdated stock options were not
disinterested, as "both have a strong financial incentive to
maintain the status quo by not authorizing any corrective action
that would devalue their current holdings or cause them to
disgorge improperly obtained profits." Conrad, 2007 WL 2593540,
at *7. The Court of Chancery similarly concluded that the

"allegations of the complaint were sufficient to excuse demand on the members of the Compensation Committee" because they faced "a substantial likelihood of personal liability for breaching their fiduciary duties." Conrad, 2007 WL 2593540, at *9 (citing Ryan). Therefore, the Court of Chancery denied the motion to dismiss for failure to meet the demand requirement.  Id.

The Plaintiffs here make similar, if not the same, factual allegations as those set forth in Conrad.  This Court accordingly adopts the analysis set forth by the Court of Chancery and excuses the Plaintiffs from the demand requirement.

**E. Failure to State a Claim**

1. The Section 10(b) Claims

To state a claim for securities fraud under section 10(b), a plaintiff must allege that: (1) the defendant "made a materially false or misleading statement or failed to state a fact necessary to make a statement not misleading; (2) in connection with the purchase or sale of a security; (3) with the intent to deceive, manipulate, or defraud; and that (4) [the defendant] was injured by his reasonable reliance" on the misrepresentations. Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 96 (1st Cir. 2007).

The Plaintiffs allege that the Defendants misrepresented the grant date of specific stock options with the intent to deceive Staples for their personal benefit and that these statements

induced Staples to "sell" its securities at a financial loss of $10,800,000.  Pls. Opp. Mem. at 11.  The Defendants argue the Plaintiffs cannot state a claim under section 10(b) because the stock option grants are not "sales," Staples was not actually harmed, and the Plaintiffs have not pled with particularity that the statements were material.  Defs. Mem. Supp. at 3.

The Defendants assert that stock option grants cannot be considered to be "sales" because they were conferred on the individual defendants as compensation.  Defs. Mem. Supp. at 11. The language of section 10(b), however, "must be read flexibly, not technically and restrictively."  Superintendent of Ins. of State of New York v. Bankers Life & Cas. Co., 404 U.S. 6, 12 (1971); see also Feldberg v. O'Connell, 338 F. Supp. 744, 746 (1972) (Ford, J.) (noting that the word "sale" in the context of section 10(b) "has been broadly interpreted by the courts"). Because the majority of the individual defendants who received the stock option grants later sold them for profit and at a loss to Staples, the Plaintiffs make sufficient allegations to satisfy this element of a section 10(b) claim.

Next, the Defendants argue Staples has not suffered economic harm as a result of the stock option grants.  Defs. Mem. Supp. at 11-12.  The result of Staples's internal audit, which explained that "the company has recorded a $10.8 million expense . . . due to the use of incorrect measurement dates," Am. Compl. ¶ 110,

easily dispenses with the Defendants' assertion.  Because the
alleged backdating is directly linked to this $10,800,000 loss,
the Plaintiffs have adequately pled this element of the claim.

With regard to the Defendants' final argument about the
materiality of the alleged statements, the First Circuit has held
that whether a statement is material is a question of fact for
the jury and thus should not be decided by a court in the context
of a motion to dismiss.  Instead, this Court should "review the
complaint only to determine that it pleads the existence of such
statements and presents a plausible jury question of
materiality."  In re Cabletron Sys., Inc., 311 F.3d 11, 34 (1st
Cir. 2002).  A fact is considered material if it is substantially
likely "that the disclosure of the omitted fact would have been
viewed by the reasonable investor as having significantly altered
the 'total mix' of information available."  Id. at 32 (quoting
Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)).

The Plaintiffs allege that the Defendants made the following
materially false or misleading statements:

(1) from 1994 to 2003, individual defendants who were
members of the Compensation Committee granted backdated stock
options to officers and directors, Am. Compl. ¶¶ 83-103, 107-08;

2) from 1995 to 2004, certain officers who are defendants
caused Staples to file false Form 4s with the SEC that concealed
the backdated stock options, id. ¶ 152;

-22-

(3) Individual defendants caused Staples to file false annual proxy statements, id. ¶¶ 130-151;

(4) Stemberg, Hanaka, Wilson, Sargent, Hickey, Mahoney, Nachbor, Anderson, Barnes, Blank, Burton, Moriarity, Nakasone, Trust, and Walsh filed and disseminated to shareholders annual reports misrepresenting Staples' finances, id. ¶¶ 123-125; and

(5) Sargent and Mahoney filed and disseminated to Staples' shareholders Certifications of the Chief Executive Officer and Chief Financial Officer, which stated that the annual reports complied with SEC regulations and fairly presented, in all material respects, the financial conditions of Staples, id. ¶ 129.

Even assuming that these alleged statements should be considered to raise a sufficient question of materiality for the purposes of the present motion under Cabletron, the Plaintiffs must also satisfy the heightened pleading requirement of Federal Rule of Civil Procedure 9(b).  Accordingly, the Plaintiffs must specify the identity of the speaker, where and when the statement was made, and why the statement was fraudulent.  See Fitzer, 119 F. Supp. 2d at 18.  The Defendants argue the Plaintiffs have failed to do so because they did not identify the speaker of each alleged misstatement.  Defs. Mem. Supp. at 6-7.  The Plaintiffs respond that it is unnecessary to specify the identity of each speaker under the group-published information doctrine, which

permits a plaintiff to "impute false or misleading statements conveyed in annual reports, quarterly and year-end financial results, or other group-published information to corporate officers."  Pls. Opp'n. Mem. at 6 (quoting In Re Raytheon Sec. Litig., 157 F. Supp. 2d 131, 152 (D. Mass. 2001) (Saris, J.)). The First Circuit, however, gives a very limited scope to this doctrine in securities fraud actions, and the application of this doctrine to cases of this nature is not well-settled.  See Cabletron, 311 F.3d at 40.

Here, the majority of the alleged misstatements, specifically those that were made in proxy statements or annual reports and were disseminated to third parties, appear to fall under the group-published doctrine.  The complaint, however, also relies upon statements made by specific members of the Compensation Committee to Staples during the process of granting stock options, which fall outside the group-published doctrine. With regard to these statements, the Plaintiffs provide little, if any, information about the exact content of the misstatements. Instead, they simply repeat that, in connection with each stock option grant, "the Compensation Committee . . . had the sole authority to choose the date, and, in fact, did choose the date on which this stock option was granted . . . . and knowingly used hindsight to pick the date when Staples' stock was at a monthly low."  Am. Compl. ¶¶ 87, 89, 91, 93, 95, 99, 101, 103.  It simply

cannot be inferred from these allegations what statements were made or what member of the Compensation Committee made them.

More importantly, the Plaintiffs must also plead facts from which a strong inference of knowledge or a high degree of recklessness on the part of individual defendants can be drawn. Aldridge, 284 F.3d at 82.  In evaluating whether this is the case, the First Circuit has declared that "each securities fraud complaint must be analyzed on its own facts; there is no one-size-fits-all template." Cabletron, 311 F.3d at 32.  Courts in this Circuit, however, have recognized a number of factual scenarios that are relevant to the question of scienter, including, inter alia, a divergence between internal reports and public statements, the disclosure of inconsistent information shortly after the making of a statement or omission, accounting shenanigans, actions taken solely out of self-interest, significant GAAP violations, and the existence of motive and opportunity.  In re Sonus Networks, Inc. Sec. Litig., 2006 WL 1308165, *12-13 (D. Mass. May 10, 2006) (Woodlock, J.).  In addition, because securities fraud claims based on backdating have unique characteristics and evidentiary difficulties, courts have been willing to consider a variety of information, such as the statistical probability about the rate of return the individual defendants received based on the stock option grants, to support an inference of scienter in these cases.  See In re

Zoran Corp. Derivative Litig., 511 F.Supp.2d 986, 1004 (N.D. Cal.
2007).

To support the inference of scienter here, the Plaintiffs
rely upon the fact that the exercise price of eleven stock option
grants coincides with particularly low closing prices or
immediately precedes a significant increase in Staples's stock.
Am. Compl. ¶ 85.  The Plaintiffs further allege that the
Defendants filed reports and proxy statements that misrepresented
the financial health of the company.  Id. ¶¶ 113, 121.  This
argument, however, is circular; whether the filings contained
misstatements is contingent on whether the alleged backdating
occurred.  Indeed, the only specific evidence that supports an
inference of scienter involves the July 3, 2003 stock option
grant, insofar as Staples did not file its report regarding that
grant with the SEC until three weeks after the deadline.  This
unexplained delay, combined with the fact that Staples later
filed a corrected exercise price that can be traced to the July
10, not the July 3, closing price, does raise this Court's
eyebrows.  Standing alone, however, it does not lead to a strong
inference of scienter.

It is true that the requisite inference of scienter may
arise through consideration of the facts taken collectively.
Tellabs, Inc., 127 S. Ct. at 2509.  Even when the complaint is
considered from this perspective, it is difficult here to see a

pattern supporting a strong inference of scienter.  As the

Defendants point out, the Plaintiffs allege only eleven of <u>fifty-</u>

<u>one</u> stock option grants occurred at suspicious times, and this

Court can readily imagine plausible, nonculpable explanations for

the post-grant rise in stock price with regard to this small

subset.

     Backdating stock options violates Staples's internal

protocols; moreover, it constitutes blatant fraud.  The ultimate

question is: did it occur here?  Upon the record before this

Court, a factfinder could reach a conclusion in the affirmative.

But while the inference that backdating occurred is reasonable,

it is not compelling or even, as required, strong.

     What is necessary, of course, is factual discovery to

uncover the thought processes of the Compensation Committee.  Why

did it award these stock options when it did, for what conduct,

against what corporate operational background, in light of what

projected stock price?  Perversely, however, in enacting the

PSLRA, Congress has barred precisely the discovery most necessary

to uncover such fraud.[7]   <u>See</u> 15 U.S.C. § 78u-4(b)(3)(B) ("[A]ll

_____

     [7] <u>See</u> Stephen J. Choi, <u>Do the Merits Matter Less After the</u>
<u>Private Securities Litigation Reform Act?</u>, 23 J.L. Econ. & Org.
598, 600-01 (2007) (noting that "without discovery . . .
plaintiffs face a difficult time in gathering facts" to prove
scienter); William S. Lerach, <u>The Private Securities Litigation</u>
<u>Reform Act of 1995 — 27 Months Later: Securities Class Action</u>
<u>Litigation Under the Private Securities Litigation Reform Act's</u>
<u>Brave New World</u>, 76 Wash. U. L.Q. 597, 607 (1998) (noting that
"only a handful of Reform Act cases have survived the motion to

discovery and other proceedings shall be stayed during the pendency of any motion to dismiss . . . .").  What's more, Congress has prescribed a relatively short statute of limitations, making it less likely that the victims of fraud will uncover it by other means in time to do anything about it.

No one suggests that securities fraud is not a concern of Congress.  The statutory scheme demonstrates, however, that Congress is content to rely on the underfunded SEC and the state courts, rather than on federal court adjudication,[8] to monitor the

---

dismiss stage").  See generally Gregory P. Joseph, Federal Litigation - Where Did It Go Off Track? (forthcoming 2008) (brief but brilliant synopsis noting the PSLRA as one reason why "today, plaintiffs with non-federal causes of action flee federal court, and those with federal claims scour the books for state law analogues.").

[8] This is far from the only instance in recent years where Congress has expressed its distrust of the precise and neutral factfinding of the American jury and the independent federal judiciary that the existence of the jury guarantees.  For instance, the Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1987, marginalized the factfinding role of the American jury in criminal cases, an act that the Supreme Court recognized as unconstitutional in United States v. Booker, 543 U.S. 220 (2005).  Other examples abound.  See, e.g., Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, § 104(c)(3), 108 Stat. 4108, 4109 (requiring creation of expensive Bankruptcy Appellate Panels under Article I to share with the federal judiciary jurisdiction over bankruptcy appeals unless certain extenuating circumstances can be shown); Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (restricting the writ of habeas corpus)(discussed in Brackett v. U.S., 206 F. Supp. 2d 183 (D. Mass. 2002) and Gonzalez v. U.S., 135 F. Supp. 2d 112 (D. Mass. 2001)); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, § 306(a)(2), 110 Stat. 3009-546, 3009-607; Real ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231 (ousting federal district courts of habeas jurisdiction with regard to deportable aliens)

nation's financial markets.  As these are policy decisions of Congress, this Court has no alternative -- even in this close case -- but to obey.  The complaint here does not adequately plead a strong inference of scienter, and therefore, the alleged violations of section 10(b) must be dismissed.  But see infra pp. 31-32.

### 2. The Section 14(a) Claims

Section 14(a) seeks to "prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." J.I. Case Co. v. Borak, 377 U.S. 426, 431 (1964).  To state a claim under the section, plaintiffs must allege that: "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury  and (3) the proxy solicitation itself, rather than the particular defect in the solicitation materials, was 'an essential link in the accomplishment of the transaction.'"  In re Tyco Int'l, Ltd., 2007 WL 1703023, *12 (D.N.H. June 11, 2007) (quoting Gen. Elec.

--------

(discussed in Enwonwu v. Chertoff, 376 F.Supp. 2d 42 (D. Mass. 2005), rev'd on other grounds, 438 F.3d 22 (1st Cir. 2006)); Military Commission Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (ousting entire federal judiciary from habeas jurisdiction over Guantanamo detainees).  But see Boumediene v. Bush, No. 06-1195 (U.S. argued Dec. 5, 2007).  See generally William G. Young, Vanishing Trials, Vanishing Juries, Vanishing Constitution, 40 Suffolk U. L. Rev. 67 (2006).

Co. v. Cathcart, 980 F.2d 927, 932 (3d Cir. 1992)).  In other
words, the Plaintiffs must establish a "causal nexus" between
their alleged injury and the corporate transaction authorized, or
defeated, by the allegedly false and misleading proxy statements.
See Royal Bus. Group, Inc. v. Realist, Inc., 933 F.2d 1056, 1063
(1st Cir. 1991).

     As a result of the statute of limitations, the May 5, 2004
proxy statement is the only statement from which a viable section
14(a) claim can arise.  In that statement, the Defendants
reported that stock options were granted on July 1, 2003 and that
the exercise price was equal to the "fair market value per share
of Staples common stock on the date of the grant."  Am. Compl. ¶
146.  The Plaintiffs thus allege that the Defendants made a
material misrepresentation by failing to report the true value of
the compensation given to corporate officers.  Id. ¶ 147.
Notably, however, the Plaintiffs fail to even suggest, much less
specifically allege, that any transaction that caused injury was
authorized or defeated as a result of the May 5, 2004 proxy
statement.[9]  The Plaintiffs, therefore, fail to state a cause of

_____

     [9]Although the shareholders may have voted to elect different
directors had they received accurate information in the May proxy
statement, that is irrelevant for purposes of the section 14(a)
analysis.  The Plaintiffs claim that their injuries stem from the
backdating scheme, the last example of which is cited as July 3,
2003.  Even had the correct information been included in the May
2004 proxy statement, the backdating – and its resultant
financial ramifications for the company – would have already
taken place.  Furthermore, the operation of the alleged

action under section 14(a) and claims are accordingly dismissed.

### 3. The Section 20(a) Claims

To state a claim of securities fraud under section 20(a), a plaintiff is required to plead: (1) a primary violation of the securities laws; and (2) that the defendant exercised actual power or control over the primary violator.  See In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 194 (1st Cir. 2005); Aldridge, 284 F.3d at 85.  Because the section 10(b) claims are insufficiently pled, the Plaintiffs also have failed to state a claim under section 20(b).

**F. Supplemental Common Law Claims**

Because all the federal claims are subject to dismissal, the usual practice in the First Circuit is to dismiss the related common law claims as well.  See Rodriquez v. Doral Mortgage Corp., 57 F.3d 1168, 1177 (1st Cir. 1995) ("As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit . . . will trigger the dismissal without prejudice of any supplemental state-law claims.").  But see In re TJX Cos. Retail Sec. Breach Litig., — F. Supp. 2d —, 2007 WL 4404166, *3–*4, appeal pending (transferring case to state court after federal claims dismissed).  This Court, however, retains jurisdiction over the

backdating scheme appears to have ceased after July 2003.  As a result, the requisite "causal nexus" between the injury and the proxy statement is lacking under this theory.

state law claims because there is complete diversity among the parties.   28 U.S.C. § 1332; <u>Strawbridge</u> v. <u>Curtiss</u>, 3 Cranch 267 (1806).   Here, these claims are virtually identical to the claims against most of the same defendants now pending before the Delaware Court of Chancery in <u>Conrad</u>.   Given this serendipitous circumstance, dismissal of the common law claims here would be improvident.

Instead, this Court will administratively close this case. It may be reopened upon the motion of any party upon the entry of final judgment in the Delaware Court of Chancery in <u>Conrad</u>, or earlier should ongoing discovery in that case give rise to a motion for reconsideration of the dismissal of the federal claims in this case.

It may seem odd that the full vindication of one of Congress' proudest achievements -- the nation's securities laws -- is today left to the courts (however distinguished) of a single state.[10]   Odd it is, but, in the particular circumstances of this case, it is also just.

## III. CONCLUSION

Accordingly, the Defendants' Motion to Dismiss [Doc. No. 17] is allowed by this Court as to the federal claims only, without prejudice to revisiting the issue as described above.   The case

---

[10] <u>See generally</u> Robert B. Thompson & Hillary A. Sale, <u>Securities Fraud as Corporate Governance: Reflections Upon Federalism</u>, 56 Vand. U. L. Rev. 859 (2003).

is otherwise administratively closed subject to being reopened,

again upon the terms described above.


SO ORDERED.

                              /s/ William G. Young
                         _____

                         WILLIAM G. YOUNG

                         DISTRICT JUDGE